[No. B179957. Second Dist., Div. Five. Aug. 29, 2005.]

PENNY GARRISON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
COUNTRY VILLA BELMONT HEIGHTS HEALTHCENTER et al., Real
Parties in Interest.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part III.C.

COUNSEL

Wilkes & McHugh, Anthony C. Lanzone, Susan B. Ghormley and Robert J. Chavez for Petitioners.

No appearance for Respondent.

Morris, Polich & Purdy, Marc S. Katz, Richard H. Nakamura, Jr., Douglas J. Loewy and Maureen MacKintosh Homes for Real Parties in Interest.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

This case arises from the death of Ella Marie Needham, which is alleged to have resulted from elder abuse and medical malpractice. Penny Garrison is the daughter of Ms. Needham. Ms. Garrison was designated as Ms. Needham's attorney in fact under a durable power of attorney. After the execution of the durable power of attorney, Ms. Needham was admitted to a residential care facility. As part of the admissions process, Ms. Garrison, acting under the durable power of attorney, executed two arbitration agreements. At issue is whether Ms. Garrison was authorized to enter into the two arbitration agreements thereby requiring that all of Ms. Needham's claims be arbitrated. In the published portion of this opinion, we conclude that Ms. Needham's various damage claims must be arbitrated. Ms. Garrison was authorized by the durable power of attorney to enter into the two binding arbitration agreements.

## II. PROCEDURAL AND EVIDENTIARY MATTERS

### A. The Allegations of the Amended Complaint

Ms. Garrison has filed suit as Ms. Needham's successor in interest pursuant to Code of Civil Procedure section 377.10 et seq. Ms. Garrison also has sued on her own behalf. Also named as plaintiffs were the children and grandchildren of Ms. Needham—Vincent Lomonaco, Frank Lomonaco, Kimberly Lynch, and Sean Lynch. There are three sets of defendants. The first set of defendants are Magnolia Royale Retirement Center and its owner Magnolia Royale, Magnolia Royale, a limited partnership. Second, Community Hospital of Long Beach is named as a defendant. The third set of defendants are Country Villa Belmont Heights Healthcenter and its owners: Country Villa South Bay, L.L.C.; Country Villa Nursing Center, Inc.; Country Villa Service Corp. doing business as Country Villa Health Services; and Country Villa Service Corp. This third group of defendants are the real parties in interest in the present writ proceeding.

On April 29, 2003, Ms. Needham, who was around 80 years of age, and suffering from Alzheimer's disease, was accepted to Magnolia Royale Retirement Center. While a patient at Magnolia Royale Retirement Center, Ms. Needham was bruised and suffered fingernail scratches. When Ms. Needham arrived at the Magnolia Royale Retirement Center, she suffered from a urinary tract infection. Throughout her stay at the Magnolia Royale Retirement Center,

Ms. Needham's urinary tract infection was not resolved due to failure to provide hydration and improper provision of medication. Further, the Magnolia Royale Retirement Center was alleged to have as among its responsibilities: providing personal assistance and care; abiding by mandated acceptance and retention limitations; conducting a preadmission appraisal; providing a preadmission appraisal; conducting a legally mandated observation of Ms. Needham; and not admitting or retaining residents with prohibitive health conditions. (Cal. Code of Regs., tit. 22, §§ 87578, 87582–87583, 87590–87591, 87701.) The employees of Magnolia Royale Retirement Center were alleged to have acted with recklessness, oppression, and malice.

Beginning on June 22, 2003, Ms. Needham was admitted to Community Hospital of Long Beach. While in the hospital, Ms. Needham fell and broke her hip. The hospital staff was alleged to have negligently failed to assess the risk that Ms. Needham would fall and prevent her from doing so.

The amended complaint does not allege the date that Country Villa Belmont Heights Healthcenter provided care to Ms. Needham. But the Country Villa Belmont Heights Healthcenter was alleged to have failed to: provide sufficient staffing levels; offer sufficient services to enable patients to attain the highest practicable, physical, mental, and psychological well-being; create an environment where Ms. Needham would not continue to fall; and properly screen Ms. Needham so as to ensure it had the ability to provide her with an adequate level of medical care. Based on these operative facts, Ms. Garrison brought causes of action for: negligence (first); elder abuse (second); fraud (third); and unlawful business practices (fourth). Each of these first four causes of action were brought on behalf of Ms. Needham. Ms. Garrison brought each of these first four causes of action as Ms. Needham's successor in interest. Ms. Garrison did not bring any of these first four causes of action on her own behalf. The fifth cause of action was for wrongful death and was brought by all of Ms. Needham's children and grandchildren, including Ms. Garrison.

## B.  The Motion to Compel Arbitration

On August 16, 2004, defendants, Country Villa South Bay, L.L.C. doing business as Country Villa Belmont Heights Healthcare Center and Country Villa Service Corp. doing business as Country Villa Health Services, moved to compel Ms. Needham, by and through Ms. Garrison, to arbitrate all of plaintiffs' claims. The moving defendants also sought to stay the then pending litigation. The principal evidence defendants offered in support of the motion to compel arbitration was the declaration of Julie Bales, the admissions coordinator at the Country Villa Belmont Heights Healthcare Center. On July 7, 2003, Ms. Bales met with Ms. Garrison about the potential admission of Ms. Needham to the Country Villa Belmont Heights Healthcare

Center. Ms. Garrison was the agent of Ms. Needham under a durable power of attorney issued on April 7, 2003 in Sonora, California.

The exact title of the power of attorney is, "ADVANCE MEDICAL DIRECTIVE AND POWER OF ATTORNEY FOR HEALTH CARE FOR [¶] ELLA[]MARIE NEEDHAM" (Original capitalization.) Under the heading "DESIGNATION OF HEALTH CARE AGENT," the durable power of attorney states in part, "I, ELLA[]MARIE NEEDHAM, do hereby appoint as my agent and successor agent those persons named below as my attorney-in-fact (agent) to make health care decisions for me as authorized in this document." (Original capitalization.) The identity of the successor agents, all family members, is irrelevant to the outcome of this petition. The durable power of attorney continues: "CREATION AND START OF POWER OF ATTORNEY FOR HEALTH CARE. [¶] By this document I intend to create a durable power of attorney for health care under Sections 4600 and following, of the California Probate Code. This durable power of attorney for health care is effective immediately upon the execution of this document. This durable power of attorney for health care shall not be affected by my subsequent incapacity." (Original capitalization.) Ms. Needham reserved the right to revoke the power of attorney orally or in writing.

The durable power of attorney sets forth the general scope of powers granted by Ms. Needham to Ms. Garrison thusly: "My agent is authorized to make all health care decisions for me, including decisions to provide, withhold, or withdraw artificial nutrition and hydration and all other forms of health care to keep me alive, subject to any limitations in this document. Subject to any limitations in this document, I hereby further grant to my agent full power and authority to make health care decisions for me to the same extent that I could make such decisions for myself if I had the capacity to do so, including all rights granted to my agent by Sections 4600 and following, of the California Probate Code. In exercising this authority, my agent shall make health care decisions that are consistent with my desires as stated in this document or otherwise made known to my agent, including, but not limited to, my desires concerning obtaining or refusing or withdrawing life-prolonging care, treatment, services, and procedures. To the extent that my wishes are unknown, my agent shall make health care decisions for me in accordance with what my agent determines to be in my best interest. In determining my best interest, my agent shall consider my personal values to the extent known by my agent."

Ms. Needham initialed a series of sentences which described when health care could be withdrawn including: when she was in an irreversible coma or a persistent vegetative state; she was unconscious and there was, to a reasonable degree of medical certainty, no chance she would regain consciousness; the likely burdens of treatment outweighed the expected benefits;

or if she suffered irreversible dementia and developed a life-threatening secondary infection The document also contains circumstances where pain alleviation modalities could be pursued.

In addition, the durable power of attorney states: "My agent shall have the sole and exclusive authority to make decisions relating to my personal care, including, but not limited to determining where I live, providing meals, hiring household employees, providing transportation, handling mail, and arranging recreation and entertainment." The durable power of attorney contains four explicit limitations on Ms. Garrison's authority (or that of a successor agent). Ms. Garrison could not, as prohibited by the Probate Code, consent to: Ms. Needham's placement in a "mental health treatment facility"; convulsive treatment as defined by Welfare and Institutions Code section 5325; psycho-surgery within the meaning of Welfare and Institutions Code section 5325; or sterilization or abortion.

Further, the durable power of attorney expressly provides Ms. Garrison with the following legal powers: the authority to execute documents involving the refusal to permit treatment; the power to sign "[a]ny necessary waiver or release from liability required by a hospital or physician"; the option of reviewing any of Ms. Needham's medical records; the ability to execute any authorization necessary to facilitate the release of medical information; and consent to the disclosure of medical information. At the end of the durable power of attorney and immediately above Ms. Needham's signature and the date of execution, the following appears, "I understand: (1) this document gives my agent serious powers over me; and (2) the powers continue after I am incapacitated; and (3) I can revoke and cancel this document at any time."

Also attached to the motion to compel were two arbitration agreements. The first document which was executed by Ms. Garrison was an arbitration agreement for medical malpractice disputes. The exact title of the document is, "ARBITRATION OF MEDICAL MALPRACTICE DISPUTES [¶] (OPTIONAL FOR RESIDENTS AND FACILITY)." (Original capitalization.) The agreement provides in part: "The parties understand that any dispute as to medical malpractice (that is, whether any medical services rendered under this Admission Agreement were necessary or unauthorized or were improperly, negligently, or incompetently rendered), will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings. By entering into this Arbitration Agreement, both parties give up their constitutional right to have any such dispute decided in a court of law before a jury, and instead accept the use of arbitration." The medical malpractice arbitration agreement further states: the resident has the option of not signing the arbitration agreement; the execution of the arbitration agreement is not a precondition to receiving medical care; either party

had the right to rescind the arbitration agreement by giving written notice within 30 days; the arbitration is to be conducted by one or more arbitrators selected by the American Arbitration Association in Los Angeles; the arbitration is to be conducted pursuant to Code of Civil Procedure section 1280 et seq.; the arbitrator is to be selected from a panel of arbitrators; if the parties cannot agree on an arbitrator, each side is to select an arbitrator who would then select the arbitrator; findings of fact and conclusions of law are to be returned; and each side is to bear its own costs and fees.

The arbitration agreement further states: "Pursuant to California Health and Safety Code Section 1430, the Resident does not waive his/her right to bring a lawsuit in court against the Facility for violations of the Patient's Bill of Rights contained in Title 22 of the California Code of Regulations Section 72527. Further, appeals made by the Resident concerning his/her transfer or discharge, as provided under state and federal law, will not be subject to this Arbitration Agreement. Finally, claims relating to disputes over payments owed to the facility or the payment of the Resident's 'share of cost' required by the Medi-Cal program, if applicable, will also not be subject to this Arbitration Agreement. [¶] This Arbitration Agreement binds the parties hereto, including the heirs, representative, executors, administrators, successors, and assigns of such parties."

The foregoing provisions of the medical malpractice arbitration agreement are in bolded font. But the final paragraph of the medical malpractice arbitration agreement is all also in bold font and capitalized: "NOTICE: BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO HAVE ANY ISSUE OF MEDICAL MALPRACTICE DECIDED BY NEUTRAL ARBITRATION, AND GIVES UP THE RIGHT TO A JURY OR COURT TRIAL. SEE THE FIRST PARAGRAPH OF THIS AGREEMENT. HOWEVER, UNDER SECTION 1430 OF THE CALIFORNIA HEALTH AND SAFETY CODE, THE RESIDENT DOES NOT WAIVE HIS/HER RIGHT TO BRING A LAWSUIT IN COURT AGAINST THE FACILITY FOR VIOLATIONS OF THE PATIENT'S BILL OF RIGHTS CONTAINED IN TITLE 22 OF THE CALIFORNIA CODE OF REGULATIONS SECTION 72527. FURTHER, APPEALS MADE BY THE RESIDENT CONCERNING HIS/HER TRANSFER OR DISCHARGE, AS PROVIDED UNDER STATE AND FEDERAL LAW, WILL NOT BE SUBJECT TO ARBITRATION. FINALLY, CLAIMS RELATING TO DISPUTES OVER PAYMENTS OWED TO THE FACILITY OR THE PAYMENT OF THE RESIDENT'S 'SHARE OF COST' REQUIRED BY THE MEDI-CAL PROGRAM, IF APPLICABLE, WILL ALSO NOT BE SUBJECT TO ARBITRATION." (Original capitalization.)

The second arbitration agreement executed by Ms. Garrison is entitled: "ARBITRATION OF DISPUTE OTHER THAN MEDICAL MALPRACTICE [¶] (OPTIONAL FOR RESIDENTS AND FACILITY)." (Original capitalization.) The agreement states: "The parties understand that, except as provided below, any claim other than a claim for medical malpractice, arising out of the provision of services by the Facility, the Admission Agreement, the validity, interpretation, construction, performance and enforcement thereof, or which allege violations of the Elder Abuse and Dependent Adult Civil Protection Act, or the Unfair Competition Act, or which seek an award of punitive damages or attorneys' fees, will be determined by submission to neutral arbitration as provided by California law . . . ." The second agreement contains the same provisions as the medical malpractice agreement concerning: waiver of the right to a jury trial; the 30-day rescission right; the use of the American Arbitration Association and manner of selecting arbitrators; allocation of costs and fees; retention of the right to sue for violations of the provisions of California Code of Regulations, title 22, section 72527; retention by the resident of the right to administratively appeal a transfer or discharge from the facility; the exclusion of issues concerning payments to the facility and specified Medi-Cal disputes from the duty to arbitrate; and the binding effect of the arbitration duty on Ms. Needham's heirs, representatives, executors, administrators, successors, and assigns.

The last paragraph of the nonmedical malpractice agreement states: "NOTICE: BY SIGNING THIS AGREEMENT THE RESIDENT AGREES TO HAVE ANY CLAIM MADE ON BEHALF OF THE RESIDENT ARISING OUT OF THE PROVISION OF SERVICES BY THE FACILITY, THE ADMISSION AGREEMENT OR THE VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE AND ENFORCEMENT THEREOF, OR WHICH ALLEGE VIOLATIONS OF THE ELDER ABUSE AND DEPENDENT ADULT CIVIL PROTECTION ACT, OR THE UNFAIR COMPETITION ACT, OR WHICH SEEK AN AWARD OF PUNITIVE DAMAGES OR ATTORNEYS' FEES, DECIDED BY NEUTRAL ARBITRATION, AND GIVES UP THE RIGHT TO A JURY OR COURT TRIAL. SEE THE FIRST PARAGRAPH OF THIS AGREEMENT." (Original capitalization.) The final paragraph reiterates the limitations on the duty to arbitrate violations of California Code of Regulations, title 22, section 72527, transfer or discharge questions, payment disputes, and specified Medi-Cal issues.

### C.   Opposition to the Motion to Compel

The opposition is premised in large part on Ms. Garrison's declaration. According to Ms. Garrison, Ms. Needham was admitted to the Belmont Heights facility on or about July 7, 2003. Two facility employees indicated

that in order for Ms. Needham to be admitted, it would be necessary for Ms. Garrison to sign all of the paperwork. Ms. Garrison was advised that the execution of the documents was "standard procedure." None of the facility employees explained the documents to Ms. Garrison. Ms. Garrison's declaration states: "Some of the numerous documents contained fine print, I did not have my glasses, and I was preoccupied with my mother's compromised health condition. Because my main concern was ensuring my mother was comfortable and safe, I was in no condition to make rational, informed decisions on the day my mother was admitted . . . ." Ms. Garrison had no "specific recollection" of signing any arbitration agreements. Ms. Garrison explained, "I was not told that signing the arbitration agreements was optional or that I had 30 days to rescind the agreement in writing." Ms. Garrison held separate written powers of attorney for health care and financial matters on behalf of Ms. Needham. Ms. Garrison stated, "I never held a Power of Attorney on [Ms.] Needham's behalf to make decisions regarding her constitutional rights, her property rights or her legal decisions."

### D. The Respondent Court's Ruling and Subsequent Events

On October 12, 2004, the respondent court granted the motion to compel arbitration. On December 20, 2004, plaintiffs filed their mandate petition seeking to set aside the October 12, 2004 order granting the motion to compel arbitration. On January 27, 2005, the mandate petition was summarily denied. On March 30, 2005, the Supreme Court granted review and ordered us to issue an order to show cause and place the matter on calendar for oral argument.

### III. DISCUSSION

### A. Applicable Arbitration Law and Standard of Review

The outcome of this appeal is controlled by the provisions of the California Arbitration Act. The July 7, 2003, arbitration agreements both explicitly provide: "The parties understand that . . . [their disputes] will be determined by submission to neutral arbitration as provided by California law, and not by a lawsuit or court process, except as California law provides for judicial review of arbitration proceedings." Hence, the United States Arbitration Act, title 9 United States Code section 1 et seq., is inapplicable to this appeal. (*Volt Info. Sciences v. Leland Stanford Jr. U.* (1989) 489 U.S. 468, 470 [103 L.Ed.2d 488, 109 S.Ct. 1248] [' "[t]he Contract shall be governed by the law of the place where the Project is located" ']; *Larian v. Larian* (2004) 123 Cal.App.4th 751, 759 [19 Cal.Rptr.3d 916] ["The September 28, 2000, arbitration agreement explicitly provides it is subject to the California Arbitration Act"]; *Mount Diablo Medical Center v. Health Net of*

*California, Inc.* (2002) 101 Cal.App.4th 711, 714–716 [124 Cal.Rptr.2d 607] [" 'The validity, construction, interpretation and enforcement of this Agreement shall be governed by the laws of the State of California' "].) As to the standard of review, there is no conflict in the evidence. The parties agree as to what the arbitration clauses state and the events leading up to their execution by Ms. Garrison. On appeal, we thus conduct independent review of the undisputed facts. (*Dream Theater, Inc. v. Dream Theater* (2004) 124 Cal.App.4th 547, 551–552 [21 Cal.Rptr.3d 322]; cf. *NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 71–72 [100 Cal.Rptr.2d 683].)

### B. Ms. Garrison's Execution of the Two Arbitration Agreements Requires All of Ms. Needham's Damage Causes of Actions Be Arbitrated.

In *Larian v. Larian, supra,* 123 Cal.App.4th at pages 759–760, we identified the extent of the duty to arbitrate under the California Arbitration Act thusly: "California law favors enforcement of arbitration agreements. (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 97 [99 Cal.Rptr.2d 745, 6 P.3d 669]; *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9 [10 Cal.Rptr.2d 183, 832 P.2d 899].) [Code of Civil Procedure section] 1281 provides: 'A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract.' The trial court has authority to compel arbitration pursuant to section 1281.2 which provides in part: 'On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy if it determines that an agreement to arbitrate the controversy exists . . . .' . . . Any doubts as to whether an arbitration clause applies to a particular dispute should be resolved in favor of requiring the parties to arbitrate. (*Vianna v. Doctors' Management Co.* (1994) 27 Cal.App.4th 1186, 1189 [33 Cal.Rptr.2d 188]; *United Transportation Union v. Southern Cal. Rapid Transit Dist.* (1992) 7 Cal.App.4th 804, 808 [9 Cal.Rptr.2d 702].) However, the right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties. (*County of Contra Costa v. Kaiser Foundation Health Plan, Inc.* (1996) 47 Cal.App.4th 237, 245 [54 Cal.Rptr.2d 628]; *Marsch v. Williams* (1994) 23 Cal.App.4th 250, 255 [28 Cal.Rptr.2d 398].) The question of whether a valid agreement to arbitrate exists is determined by reference to the law applicable to contracts generally. (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 971–973 [64 Cal.Rptr.2d 843, 938 P.2d 903]; *Kinney v. United HealthCare Services, Inc.* (1999) 70 Cal.App.4th 1322, 1327–1328 [83 Cal.Rptr.2d 348].) Although, as noted, California has a strong public policy in favor of arbitration, there is no

preference for the arbitral forum when the parties have not agreed to arbitrate. (*Freeman v. State Farm Mut. Auto. Ins. Co.* (1975) 14 Cal.3d 473, 481 [121 Cal.Rptr. 477, 535 P.2d 341]; *Cione v. Foresters Equity Services, Inc.* (1997) 58 Cal.App.4th 625, 634 [68 Cal.Rptr.2d 167].)"

■ An agent or fiduciary has the authority to require a patient's medical malpractice claims to be arbitrated. The black letter statement of California law in this regard is, "We therefore conclude that an agent or other fiduciary who contracts for medical treatment on behalf of his beneficiary retains the authority to enter into an agreement providing for arbitration of claims for medical malpractice." (*Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 709 [131 Cal.Rptr. 882, 552 P.2d 1178], fn. omitted; see *Hawkins v. Superior Court* (1979) 89 Cal.App.3d 413, 418 [152 Cal.Rptr. 491].) Among the scenarios where a person is authorized to bind another to an arbitration agreement in the medical care context are: a child is bound by a parent's agreement to arbitrate tort claims with a medical care provider (*Doyle v. Giuliucci* (1965) 62 Cal.2d 606, 610 [43 Cal.Rptr. 697, 401 P.2d 1]); a state employee must arbitrate a medical malpractice claim when the agreement to arbitrate was entered into by the Board of Administration of the State Employees Retirement System (*Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pp. 702–709); an employer's agreement may compel an employee to arbitrate medical malpractice claims with a health care provider (*Engalla v. Permanente Medical Group, Inc., supra,* 15 Cal.4th at pp. 977–978); a child who was unborn at the time of the act of prenatal medical malpractice and who does not become a member of the health plan which contains the arbitration clause until the time of birth, is bound by the parent's agreement to arbitrate (*Wilson v. Kaiser Foundation Hospitals* (1983) 141 Cal.App.3d 891, 893, 898–900 [190 Cal.Rptr. 649]); a wife is subject to husband's agreement to arbitrate (*NORCAL Mutual Ins. Co. v. Newton, supra,* 84 Cal.App.4th at pp. 66–84); a wife is bound by the arbitration provisions contained in the health care plan contract in which her deceased husband had them enrolled (*Hawkins v. Superior Court, supra,* 89 Cal.App.3d at pp. 415–419); an unmarried father may be compelled to arbitrate when the mother executed the arbitration agreement while she was pregnant (*Michaelis v. Schori* (1993) 20 Cal.App.4th 133, 139 [24 Cal.Rptr.2d 380]); and a participating physician is bound by the medical plan's agreement to arbitrate malpractice disputes with its patients (*Harris v. Superior Court* (1986) 188 Cal.App.3d 475, 476–479 [233 Cal.Rptr. 186]).

But plaintiffs contend that the foregoing authority is inapplicable because of the holdings of two decisions decided by Divisions Seven and Eight of this appellate district which involve adult children securing medical care for elderly parents. In *Pagarigan v. Libby Center Care, Inc.* (2002) 99 Cal.App.4th 298, 301–302 [120 Cal.Rptr.2d 892], our colleague, Associate Justice Earl Johnson Jr., explained that two adult children of their deceased

mother had no authority to enter into an arbitration agreement on her behalf. Associate Justice Johnson further noted that the two adult children's status as next of kin did not authorize them to sign an arbitration agreement on their mother's behalf at the request of the nursing home staff. (*Id.* at p. 302.) In *Goliger v. AMS Properties, Inc.* (2004) 123 Cal.App.4th 374, 375–376 [19 Cal.Rptr.3d 819], an adult child signed a comatose parent's admission papers to a residential health care facility which contained an arbitration clause. Our Division Eight colleagues concurred in the analysis in *Pagarigan* and held the adult child could not bind the parent to the arbitration clause. (*Goliger v. AMS Properties* at pp. 376–377.) None of the adult children in *Pagarigan* and *Goliger* acted pursuant to a durable power of attorney in securing medical care for their aged parents.

Plaintiffs rely on *Pagarigan* and *Goliger* and assert in this case that Ms. Garrison's execution of the two arbitration agreements was without any legal effect. We respectfully disagree with plaintiffs. Unlike *Pagarigan* and *Goliger*, Ms. Garrison was authorized under the written durable health care power of attorney to act on behalf of Ms. Needham. The durable power of attorney for health care in this case authorized Ms. Garrison to make "all health care decisions" for Ms. Needham. Later, the instrument stated: "I . . . grant to my agent full power and authority to make health care decisions for me to the same extent that I could make such decisions for myself if I had the capacity to do so, including all rights granted to my agent by Sections 4600 and following, of the California Probate Code." At another place, the durable power of attorney vests Ms. Garrison to act as Ms. Needham's agent thusly: "In exercising this authority, my agent shall make health care decisions that are consistent with my desires as stated in this document or otherwise made known to my agent, including, but not limited to, my desires concerning obtaining or refusing or withdrawing life-prolonging care, treatment, services, and procedures. To the extent that my wishes are unknown, my agent shall make health care decisions for me in accordance with what my agent determines to be in my best interest. In determining my best interest, my agent shall consider my personal values to the extent known by my agent." Further, Ms. Garrison was authorized to decide even where Ms. Needham would live. At no place does the durable health care power of attorney restrict Ms. Garrison's authority as an agent to enter into an arbitration agreement on behalf of Ms. Needham.

There are three provisions of the Health Care Decisions Law in Probate Code section 4600 et seq. that control the outcome of this case. First, Probate Code section 4683, subdivision (a) states: "Subject to any limitations in the power of attorney for health care: [¶] (a) An agent designated in the power of attorney may make health care decisions for the principal to the same extent the principal could make health care decisions if the principal had the capacity to do so. [¶] (b) The agent may also make decisions that may be

effective after the principal's death, including the following: [¶] (1) Making a disposition under the Uniform Anatomical Gift Act (Chapter 3.5 (commencing with Section 7150) of Part 1 of Division 7 of the Health and Safety Code). [¶] (2) Authorizing an autopsy under Section 7113 of the Health and Safety Code. [¶] (3) Directing the disposition of remains under Section 7100 of the Health and Safety Code." Second, Probate Code section 4684 states: "An agent shall make a health care decision in accordance with the principal's individual health care instructions, if any, and other wishes to the extent known to the agent. Otherwise, the agent shall make the decision in accordance with the agent's determination of the principal's best interest. In determining the principal's best interest, the agent shall consider the principal's personal values to the extent known to the agent." Third, Probate Code section 4688 states, "Where this division does not provide a rule governing agents under powers of attorney, the law of agency applies."

■ Under the combined effect of these three provisions of the Health Care Decisions Law, Ms. Garrison had the authority to enter into the two arbitration agreements on behalf of Ms. Needham. Ms. Garrison executed the arbitration agreements while making health care decisions on behalf of Ms. Needham. Whether to admit an aging parent to a particular care facility is a health care decision. The revocable arbitration agreements were executed as part of the health care decisionmaking process. Moreover, the durable power of attorney expressly states, "[M]y agent shall make health care decisions for me in accordance with what my agent determines to be in my best interest." Ms. Garrison was granted the authority to choose a health care facility which: does not require arbitration; makes arbitration optional as to some possible disputes, as here, and includes a 30-day time period to cancel the agreements to arbitrate; or absolutely requires the use of arbitration to resolve disputes over care. In this case, Ms. Garrison was authorized to act as Ms. Needham's agent in making the decision to utilize a health care facility which included an optional revocable arbitration agreement. Ms. Garrison was expressly authorized to even determine where Ms. Needham would live. Moreover, Probate Code section 4683, subdivision (b) allows the attorney in fact to "make decisions after the principal's death" which would include how to resolve disputes with the health care provider.

■ Also, as noted, Probate Code section 4688 clarifies that if there are any matters not covered by the Health Care Decisions Law, the law of agency is controlling. Civil Code section 2319 states: "An agent has authority: [¶] 1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency . . . ." The decision to enter into optional revocable arbitration agreements in connection with placement in a health care facility, as occurred here, is a "proper and usual" exercise of an agent's powers.

■ In *Madden v. Kaiser Foundation Hospitals, supra,* 17 Cal.3d at pages 706–709, the Supreme Court explained that the Board of Administration of the State Employees Retirement System was authorized to negotiate health plans on behalf of state employees. In that capacity, a health plan was negotiated which contained an arbitration clause. The Supreme Court identified the issue of the enforceability of the arbitration clause and the powers of an agent in light of the aforementioned provisions of Civil Code section 2319 as follows: "This preliminary doctrinal recitation sets the stage for the principal issue of this appeal: whether the board, as agent of the employees, had implied authority to agree to a contract which provided for arbitration of all disputes, including malpractice claims, arising under that contract. That issue turns on the application of Civil Code section 2319, which authorizes a general agent 'To do everything necessary or proper and usual . . . for effecting the purpose of his agency.' For the reasons explained below, we conclude that arbitration is a 'proper and usual' means of resolving malpractice disputes, and thus that an agent empowered to negotiate a group medical contract has the implied authority to agree to the inclusion of an arbitration provision." (*Madden v. Kaiser Foundation Hospitals* at p. 706; see *Wheeler v. St. Joseph Hospital* (1976) 63 Cal.App.3d 345, 364 [133 Cal.Rptr. 775].) The Supreme Court then held that: arbitration was a favored method of resolving disputes; there had been a dramatic development in the use of arbitration; in certain contexts, arbitration was mandatory; and there was a "growing interest in and use of arbitration to cope" with medical malpractice claims. (*Madden v. Kaiser Foundation Hospitals* at pp. 707–709.) As a result, *Madden* concluded that "an agent or fiduciary" who makes medical care decisions retains the power to enter into an arbitration agreement. (*Id.* at p. 709; see *Victoria v. Superior Court* (1985) 40 Cal.3d 734, 745–746 [222 Cal.Rptr. 1, 710 P.2d 833].) No doubt, *Madden* involves slightly different facts. But its analysis as to the "proper and usual" nature of selecting arbitration as part of an agent's selection of health care options is directly pertinent to this case. Probate Code section 4688 makes it clear that when the Health Care Decisions Law fails to directly address an issue, the law of agency, which includes Civil Code section 2319 as interpreted in *Madden,* applies. Considered together, all of these factors lead us to conclude that Ms. Needham's damage claims are subject to the two arbitration agreements entered into by Ms. Garrison. We uphold the respondent court's analysis in this respect.

C.\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

\*See footnote, *ante,* page 253.

## IV. DISPOSITION

The mandate petition is granted so as to allow reconsideration of the petition to compel arbitration in light of the views expressed in the body of this opinion. All parties are to bear their own costs in connection with these extraordinary writ proceedings.

Armstrong, J., and Mosk, J., concurred.

Petitioners' petition for review by the Supreme Court was denied November 16, 2005. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.