Filed 8/18/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CHARLES LOGAN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>COUNTRY OAKS PARTNERS, LLC, et al.,<br><br>    Defendants and Appellants. | B312967<br><br>(Los Angeles County Super. Ct. No. 20STCV26536) |

APPEAL from an order of the Superior Court of Los Angeles County, Monica Bachner, Judge. Affirmed.

Cole Pedroza, Kenneth R. Pedroza and Cassidy C. Davenport; Sun Mar Management Services, Trent Evans and Kevin Khachatryan for Defendants and Appellants.

Lanzone Morgan, Ayman R. Mourad and Alexander S. Rynerson for Plaintiffs and Respondents.

## INTRODUCTION

Plaintiff Charles Logan designated his nephew, Mark Harrod, as his health care agent and attorney-in-fact using an advance health care directive and power of attorney for health care decisions form developed by the California Medical Association (the Advance Directive). After the execution of the Advance Directive, Logan was admitted to a skilled nursing facility. Nineteen days later, Harrod executed an admission agreement and a separate arbitration agreement purportedly on Logan's behalf as his "Legal Representative/Agent."

The sole issue on appeal is whether Harrod was authorized to sign the arbitration agreement on Logan's behalf. The answer turns on whether an agent's authority to make "health care decisions" on a principal's behalf includes the authority to execute optional arbitration agreements. We conclude it does not. We therefore affirm the trial court's order denying the motion to compel arbitration.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2017, Logan executed the Advance Directive under California Probate Code[1] sections 4600-4805 (Health Care Decisions Law), appointing Harrod as his health care agent. Under the Advance Directive, if Logan's primary physician found he could not make his own health care decisions, Harrod had the "full power and authority to make those decisions for [Logan]," subject to any health care instructions set forth in the Advance Directive. In the Advance Directive, Logan specified that Harrod

_____

[1] All further undesignated statutory references are to the Probate Code.

"will have the right to: [¶] A. Consent, refuse consent, or withdraw consent to any medical care or services, such as tests, drugs, surgery, or consultations for any physical or mental condition. This includes the provision, withholding or withdrawal of artificial nutrition and hydration (feeding by tube or vein) and all other forms of health care, including cardiopulmonary resuscitation (CPR). [¶] B. Choose or reject my physician, other health care professionals or health care facilities. [¶] C. Receive and consent to the release of medical information. [¶] D. Donate organs or tissues, authorize an autopsy and dispose of my body, unless I have said something different in a contract with a funeral home, in my will, or by some other written method." The Advance Directive does not specifically address Harrod's authority to execute an arbitration agreement on Logan's behalf.

On November 10, 2019, Logan was transferred from a hospital to Country Oaks Partners, LLC dba Country Oaks Care Center (Country Oaks), a skilled nursing facility. Nineteen days later, on November 29, 2019, Harrod executed an admission agreement, and a separate arbitration agreement purportedly on Logan's behalf as his "Legal Representative/Agent." The arbitration agreement stated (in boldface): "Residents shall not be required to sign this Arbitration Agreement as a condition of admission to this facility or to continue to receive care at the facility."

On December 13, 2019, Logan was transferred from Country Oaks to another skilled nursing facility. Following his discharge from Country Oaks, Logan filed a complaint against Country Oaks and its owner and operator, Sun Mar Management Services, Inc., alleging causes of action for declaratory relief,

3

elder abuse and neglect, negligence, and violation of Residents' Bill of Rights (Health and Saf. Code, § 1430, subd. (b).)[2]

Country Oaks filed a petition to compel arbitration. Following an initial hearing on the petition, the trial court continued the hearing to allow both parties to submit supplemental briefing on the issue of whether a health care agent may bind his principal to arbitration. After reviewing the supplemental briefs and hearing oral argument, the trial court denied the petition. The court concluded Country Oaks failed to meet its burden of proving the existence of a valid, enforceable arbitration agreement because Harrod lacked authority to enter into the agreement on Logan's behalf. It explained that although the Advance Directive was effective at the time Logan entered the facility,[3] the Advance Directive "only entitle[d] Harrod to make health care decisions for [Logan], not enter a binding arbitration agreement on his behalf."

Country Oaks timely appealed the order denying its petition.

---

[2] Logan also named Alessandra Hovey, the administrator of Country Oaks, as a defendant in the complaint. Logan dismissed Hovey from the action on December 17, 2020.

[3] On appeal, neither party disputes the trial court's factual finding that the Advance Directive sprung into effect at the time Logan was admitted to Country Oaks (i.e., that Logan's primary physician found he could not make his own health care decisions).

## DISCUSSION

### A.  Governing Law and Standard of Review

The Federal Arbitration Act (FAA) provides arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.)[4] "'[E]ven when the [FAA] applies, [however], interpretation of the arbitration agreement is governed by state law principles . . . . Under California law, ordinary rules of contract interpretation apply to arbitration agreements. . . . '"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. . . ."'"" (*Valencia v. Smyth* (2010) 185 Cal.App.4th 153, 177.)

Although federal and California law favor enforcement of valid arbitration agreements, ""[t]here is no public policy favoring arbitration of disputes which the parties have not agreed to arbitrate."' [Citation.]" (*Metters v. Ralphs Grocery Co.* (2008) 161 Cal.App.4th 696, 701.) "The party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement." (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 586.)

The issue on appeal—i.e., did the Advance Directive confer authority on Harrod to enter into an arbitration agreement on Logan's behalf—presents a legal question. We therefore apply the de novo standard of review. (See *Lopez v. Bartlett Care Center,*

---

4      The arbitration agreement states: "The parties to this Arbitration Agreement acknowledge and agree that the Admission Agreement and this Arbitration Agreement evidence a transaction in interstate commerce governed by the [FAA]."

5

*LLC* (2019) 39 Cal.App.5th 311, 317 [legal conclusions underlying a trial court's denial of a petition to compel arbitration are reviewed de novo].)

## B. Harrod Lacked Authority to Bind Logan to Arbitration with Country Oaks

Country Oaks contends the Advance Directive granted Harrod actual authority to execute the arbitration agreement on Logan's behalf. Relying on *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253 (*Garrison*), Country Oaks argues that because the Advance Directive expressly authorized Harrod to make health care decisions, including "choos[ing] . . . health care facilities," Harrod also was authorized to sign an optional arbitration agreement when admitting Logan to the nursing facility. We respectfully disagree with the reasoning set forth in *Garrison* and conclude the Advance Directive did not confer such broad authority on Harrod.

In *Garrison*, a daughter, who was designated as her mother's attorney-in-fact under a health care power of attorney, admitted her mother into a health care facility. (*Garrison, supra*, 132 Cal.App.4th at p. 256.) In doing so, the daughter signed two arbitration agreements (one pertaining to medical malpractice claims and one pertaining to all other claims against the facility). (*Id*. at pp. 256, 259-261.) Following the death of her mother, the daughter and other family members sued the facility. (*Id*. at pp. 256-257.) The trial court granted the facility's motion to compel arbitration, and the Court of Appeal agreed that the daughter had authority to enter into the arbitration agreements on her mother's behalf. (*Id*. at pp. 262, 266.)

The health care power of attorney at issue in *Garrison* provided the daughter was authorized to "'make health care

6

decisions'" for the mother. *(Garrison, supra*, 132 Cal.App.4th at p. 265.) In concluding the daughter had authority to sign the arbitration agreements because they were "executed as part of the health care decisionmaking process," the *Garrison* court relied on three provisions of the Health Care Decisions Law in Probate Code section 4600 et seq. *(Garrison, supra*, 132 Cal.App.4th at pp. 265-266.) As discussed below, we are unpersuaded these provisions support that conclusion.

First, the *Garrison* court relied on section 4683, subdivisions (a) and (b), which provide, in relevant part: "An agent designated in the power of attorney may make health care decisions for the principal to the same extent the principal could make health care decisions if the principal had the capacity to do so" and "may also make decisions that may be effective after the principal's death." That an agent is permitted to make health care decisions to the same extent as the principal says nothing, however, about the agent's authority to agree to enter into an arbitration agreement and thereby waive the principal's right to a jury trial. As defined in the Health Care Decisions Law, the provisions of which are specifically referenced in the Advance Directive, a "health care decision" is limited to "a decision made by a patient or the patient's agent . . . , regarding the patient's health care . . . ." (§ 4617.) "Health care," in turn, is defined as "any care, treatment, service, or procedure to maintain, diagnose, or otherwise affect a patient's physical or mental condition." (§ 4615.) Thus, section 4683 merely confers upon the agent the authority to make decisions affecting the principal's "physical or mental health" to the same extent the principal could make those decisions. The decision to waive a jury trial and instead engage in binding arbitration does not fit within these definitions. It is not

7

a health care decision. Rather it is a decision about how disputes over health care decisions will be resolved.

The *Garrison* court next relied on section 4684, which provides: "An agent shall make a health care decision in accordance with the principal's individual health care instructions, if any, and other wishes to the extent known to the agent. Otherwise, the agent shall make the decision in accordance with the agent's determination of the principal's best interest. In determining the principal's best interest, the agent shall consider the principal's personal values to the extent known to the agent." (*Garrison, supra*, 132 Cal.App.4th at p. 266.) Where, as here, neither the plain language of the Advance Directive nor any evidence in the record demonstrates Logan's wishes or personal values regarding arbitration, we fail to see how section 4684 sheds light on whether the agent's execution of an arbitration agreement is a "health care decision."

Finally, the *Garrison* court cites to section 4688, which "clarifies that if there are any matters not covered by the Health Care Decisions Law, the law of agency is controlling." (*Garrison, supra*, 132 Cal.App4th at p. 266.) It therefore turned to Civil Code section 2319: "An agent has authority: [¶] 1. To do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency . . . ." Relying on our Supreme Court's decision in *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699 (*Madden*), the *Garrison* court held "[t]he decision to enter into optional revocable arbitration agreements in connection with placement in a health care facility, as occurred here, is a 'proper and usual' exercise of an agent's powers." (*Garrison, supra*, 132 Cal.App.4th at p. 266.) The

8

facts in *Madden*, however, are distinguishable from both the facts in *Garrison* and this case.

In *Madden*, the defendants appealed from "an order denying enforcement of an arbitration provision in a medical services contract entered into between the Board of Administration of the State Employees Retirement System . . . and defendant Kaiser Foundation Health Plan." (*Madden, supra,* 17 Cal.3d at p. 702, fn. omitted.) Plaintiff, a state employee who enrolled under the Kaiser plan, contended she was not bound by the provision for arbitration. (*Ibid.*) Our Supreme Court held that Civil Code section 2319 granted the Board (as agent for the employee) the authority to do whatever is "'proper and usual'" to carry out its agency, and therefore the Board "enjoyed an implied authority to agree to arbitration of malpractice claims of enrolled employees." (*Id.* a pp. 702-703.) Thus, based on *Madden*, when two parties "possessing parity of bargaining strength" (*id.* at p. 711) negotiate a group contract, it is "proper and usual" to negotiate provisions of the contract, which may include an arbitration provision. The holding in *Madden* is inapplicable here, however, where the skilled nursing facility's admission agreement does not contain an arbitration provision negotiated between parties of equal bargaining power. Rather, as required by California and federal law, Country Oaks presented Harrod with a separate document from the admission contract, which contained an optional arbitration agreement. (See Health & Saf. Code, § 1599.81, subds. a & b ["(a) All contracts of admission that contain an arbitration clause shall clearly indicate that agreement to arbitration is not a precondition for medical treatment or for admission to the facility. [¶] (b) All arbitration clauses shall be included on a form separate from the

rest of the admission contract. . . .”; see also 42 C.F.R. § 483.70(n)(1) (2019) [“The facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility and must explicitly inform the resident or his or her representative of his or her right not to sign the agreement as a condition of admission to, or as a requirement to continue to receive care at, the facility.”].) There is nothing, therefore, “necessary or proper and usual” about signing an optional arbitration agreement “for effecting the purpose of his agency,” i.e., placing Logan into a skilled nursing facility. Rather, the “health care decision” (whether to consent to admission into the skilled nursing facility) has been expressly decoupled from the decision whether to enter into the optional arbitration agreement.

Based on the foregoing, we decline to follow *Garrison*’s broad interpretation of “health care decisions.”[5] Rather, we begin our analysis by reviewing the plain language of the Advance Directive. (See *Tran v. Farmers Group, Inc.* (2002) 104 Cal.App.4th 1202, 1214 [“The scope of a power of attorney depends on the language of the instrument, which is strictly construed. [Citation.]”].) Logan stated in the Advance Directive: “If my primary physician finds that I cannot make my own health care decisions, I grant my agent full power and authority to make

5      We note *Hogan v. Country Villa Health Services* (2007) 148 Cal.App.4th 259, 262 followed *Garrison,* opining *Garrison* was “well reasoned.” In *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1129, however, the court in dicta disagreed with the *Garrison* court’s conclusion that the “the term ‘health care decision’ made by an agent encompasses the execution of arbitration agreements on behalf of the patient.”

10

those decisions for me, subject to any health care instructions set forth below." That grant of authority is immediately followed by a list of four specific powers granted to Harrod, including the power to "[c]hoose or reject my physician, other health care professionals or health care facilities."

The Advance Directive does not address arbitration agreements or the resolution of legal claims. Nor can we infer Harrod had authority to enter into an optional arbitration agreement from the fact he had express authority to make "health care decisions" and "[c]hoose . . . health care facilities." As discussed above, an agent's decision to sign an *optional* arbitration agreement with a skilled nursing facility is not a decision regarding the "patient's physical or mental condition." (§ 4615.)

Our conclusion that the execution of an arbitration agreement is not a "health care decision" finds further support in the regulatory history of the recently enacted federal regulatory scheme prohibiting nursing facilities participating in Medicare or Medicaid programs from requiring a resident (or his representative) to sign an arbitration agreement as a condition of admission. (42 C.F.R. § 483.70(n)(1) (2019).) Specifically, in the Centers for Medicare & Medicaid Services' (i.e., the agency's) responses to public comments published in the Federal Register, the agency explained: "[C]ommenters noted that the number of [nursing] facilities practically available to an individual may be extremely limited. For example, it is entirely reasonable for a resident to want to remain close to family and friends. However, many times there is only one nursing home within a reasonable geographic distance of the resident's family or friends. Likewise, factors such as the type of payment the facility will accept, the

health care and services it offers, and the availability of beds limit an individual's choice of facilities. Therefore, many residents may only have a few, and perhaps only one or two, suitable facilities from which to choose. Once a facility is selected, commenters stated that some residents believe they have no choice but to sign the [arbitration] agreement in order to obtain the care they need." (84 FR 34727-34728 (2019).) The agency "agree[d] that many residents or their families usually do not have many [nursing] facilities to choose from and the existence of one of these agreements as a condition of admission is not likely to be a deciding factor in choosing a facility. We also agree that no one should have to choose between receiving care and signing an arbitration agreement. Therefore, we have finalized § 483.70(n)(1) to state that the facility must not require any resident or his or her representative to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at, the facility." (84 FR 34728 (2019).) These comments and responses demonstrate that, practically speaking, arbitration agreements are not executed as part of the health care decisionmaking process, but rather are entered into only *after* the agent chooses a nursing facility based on the limited options available and other factors unrelated to arbitration (such as geographic distance from family members and type of payment the facility will accept).

Accordingly, for the reasons discussed above, we conclude the authority granted to Harrod in the Advance Directive to make health care decisions of behalf of Logan, including choosing a skilled nursing facility, does not extend to executing optional arbitration agreements. Because Harrod lacked authority to sign

12

the arbitration agreement, the trial court properly denied Country Oaks' petition to compel arbitration.

**DISPOSITION**

The order is affirmed. Logan is awarded his costs on appeal.

**CERTIFIED FOR PUBLICATION**


CURREY, J.

We concur:




WILLHITE, Acting P.J.




COLLINS, J.

13