Connie A. MOLINA, Executor of the Estate of Helen M. Jasso, Deceased; Connie A. Molina, Executor of the Estate of Jesse R. Jasso, Deceased; Victoria Terronex, Daughter and Survivor of Helen M. Jasso; and Connie A. Molina, Daughter and Survivor of Helen M. Jasso, Plaintiffs,

v.

The EVANGELICAL LUTHERAN GOOD SAMARITAN SOCIETY d/b/a/ Good Samaritan Society Davenport, A Foreign Non–Profit Corporation Authorized to do Business in the State of Iowa, Defendant.

Civil No. 3:13–cv–00118.

United States District Court,
S.D. Iowa,
Davenport Division.

Feb. 4, 2014.

Michael C. Walker, Davenport, IA, for Plaintiffs.

Christopher P. Jannes, Kendall R. Watkins, Davis Brown Law Firm, Des Moines, IA, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is The Evangelical Lutheran Good Samaritan Society d/b/a Good Samaritan Society Davenport's ("Defendant") Combined Motion to Dismiss or Stay the Proceedings and to Compel Arbitration ("Motion"), filed on November 22, 2013. Clerk's No. 4. Connie A. Molina ("Molina") and Victoria Terronez (collectively "Plaintiffs") filed a brief in resistance to the Motion ("Resistance") on December 9, 2013. Clerk's No. 7. Defendant filed a reply ("Reply") on December 16, 2013. Clerk's No. 8. The matter is fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 1, 2013, Plaintiffs filed a Petition (hereinafter "Complaint") against Defendant in the Iowa District Court for Scott County, Iowa, asserting various tort claims against Defendant for allegedly pro-

viding negligent care to Helen M. Jasso ("Jasso"). *See* Clerk's No. 1–1. Defendant removed the action to this Court on November 15, 2013, pursuant to 28 U.S.C. §§ 1332(a)(1), 1441(a), and 1446.[1] *See* Notice of Removal ("Removal") (Clerk's No. 1).

Jasso was admitted to Defendant's facility on November 4, 2011. *See* Compl. ¶ 7. At the time of Jasso's admission, she was accompanied by her daughter, Molina. Resistance at 2. Because Jasso showed symptoms of "weakness and confusion," she was unable to sign the admission agreement ("Agreement"); instead, Molina signed the Agreement in a field designated "Signature of Responsible Party (if applicable)." *See* Def.'s Ex. A (Agreement) (Clerk's No. 4–3) at 15. The Agreement stated that Defendant "hereby enters into this Agreement with Helen M. Jasso, the 'Resident' and Helen M. Jasso or Connie Molina, the Resident's spouse, legal guardian, conservator, agent/attorney-in-fact or Responsible Party acting on the Resident's behalf who has access to the Resident's income or resources." *Id.* at 1. The Agreement further stated that any references to Jasso or "the Resident" throughout the Agreement "also applie[d] to the Resident's spouse, legal guardian, conservator, agent/attorney-in-fact, Responsible Party or any other person signing this Agreement." *Id.* The Agreement also pur-

ported to bind "heirs, personal representatives, executors, administrators and assigns of the Resident." *Id.*

According to Plaintiffs, Defendant's staff assessed Jasso at the time of her admission and designated her as a falling risk. Compl. ¶ 8. Accordingly, the admitting physician prescribed fall protection for Jasso. *Id.* ¶ 9. At approximately 2:00 a.m. on November 8, 2011, Jasso fell to the floor while returning from the bathroom located in her room at Defendant's facility. *Id.* ¶ 13. The fall resulted in injuries that Plaintiffs claim led to Jasso's death on February 11, 2012. *Id.* ¶ 15.

Defendant contends that the Court must compel arbitration to resolve this dispute, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., and an arbitration provision within the Agreement. *See* Mot. ¶¶ 11–19. Specifically, Defendant points to the "Resolution of Legal Disputes" provision ("Arbitration Provision"), which provides that all disputes pertaining to the "Agreement, or breach thereof, or, related to the care of stay at the Facility, shall be settled exclusively by binding arbitration," including claims brought by "any spouse or heirs of the Resident." Agreement at 14. The Arbitration Provision "is meant to apply to all controversies, disputes, disagreements, or claims including, but not limited to, . . . all

---

1. "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different states." 28 U.S.C. § 1332(a)(1). Where the estate of a decedent is party to a suit, "the legal representative of the estate . . . shall be deemed to be a citizen only of the same State as the decedent." *Id.* § 1332(c)(2). Defendant has established the amount in controversy to exceed $75,000 (Removal ¶ 8) and has identified itself as a North Dakota corporation with its principal place of business in South Dakota. *Id.* ¶ 7. Defendant has also identified Plain-

tiffs, in their individual capacities, to be Illinois citizens. *Id.* ¶ 5–6. However, Defendant *failed to identify the citizenship of the two decedents, Helen M. Jasso and Jesse R. Jasso, who are parties to this action via their estates. See id.* ¶ 3–4. This Court, as a court of limited jurisdiction, has a duty to assure itself that it has subject matter jurisdiction in every case. *See Barclay Square Props. v. Midwest Fed. Sav. & Loan Ass'n of Minneapolis,* 893 F.2d 968, 969 (8th Cir.1990). Accordingly, no later than February 18, 2014, Defendant shall amend the Removal to reflect the decedents' citizenship.

negligence and malpractice claims, [and] all tort claims." *Id.* The box designated "YES I DO wish to arbitrate disputes" is marked at the bottom of the page, accompanied by Molina's initials and the date, "11/4/11." *Id.* The Arbitration Provision contains a clause, printed in bold at the top of the page, stating that "the Resident's agreement to the Resolution of Legal Disputes is not a condition of admission or of continued stay." *Id.*

Plaintiffs resist dismissing the present suit in favor of arbitration on the grounds that the Arbitration Provision is invalid and unenforceable. Resistance at 2. In the alternative, Plaintiffs contend that: (1) the FAA does not apply to the Arbitration Provision; and (2) Plaintiffs' present claims are not encompassed by the Arbitration Provision. *Id.*

## II. LAW AND ANALYSIS

Under the FAA, a written arbitration agreement in any "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision reflects "both a 'liberal federal policy favoring arbitration,' ... and the 'fundamental principle that arbitration is a matter of contract.'" *AT & T Mobility LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) and *Rent–A–Center, W., Inc. v. Jackson,* 561 U.S. 63, 130 S.Ct. 2772, 2776, 177 L.Ed.2d 403 (2010)). Therefore, the FAA policy favoring arbitration agreements may still be overcome by "generally applicable contract defenses." *Concepcion,* 131 S.Ct. at 1746 (quoting *Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)). In assessing a party's motion to compel arbitration under the FAA, the district court's role is limited to determining: (1) whether the arbitration agreement between the parties is valid; and (2) whether the plaintiff's claim is governed by the arbitration agreement. *Larry's United Super, Inc. v. Werries,* 253 F.3d 1083, 1085 (8th Cir.2001).

Because FAA applicability is a matter of contract, "[s]tate contract law governs whether an arbitration agreement is valid." *Lyster v. Ryan's Family Steak Houses, Inc.,* 239 F.3d 943, 946 (8th Cir. 2001). Iowa law requires an enforceable agreement to contain an offer, acceptance, and consideration. *See Taggart v. Drake Univ.,* 549 N.W.2d 796, 800 (Iowa 1996). The party seeking to enforce the agreement has the burden of proving its validity. *Owen v. MBPXL Corp.,* 173 F.Supp.2d 905, 922 (N.D.Iowa 2001) (citing *North v. State,* 400 N.W.2d 566, 568 (Iowa 1987)).

In the present case, Defendant claims that the Arbitration Provision is valid because it was offered by Defendant and accepted by Molina, who was a responsible party acting on Jasso's behalf. Def.'s Br. in Supp. of Its Mot. ("Def.'s Br.") (Clerk's No. 4–1) at 2. Plaintiffs counter, arguing that Molina lacked legal authority to bind Jasso, rendering her unable to accept the Arbitration Provision on Jasso's behalf. Resistance at 4. Thus, because neither Jasso nor a legally responsible party acting on Jasso's behalf accepted the Arbitration Provision, it is unenforceable against her estate. *Id.*

The parties raise three potential theories regarding Molina's authority, or lack thereof, to accept the Arbitration Provision on Jasso's behalf: (1) the Agreement's language regarding "Responsible Part[ies]" (*see* Resistance at 3); (2) Molina's apparent authority to bind Jasso to the Arbitration Provision (*see id.* at 4–5); and (3) "surrogate decisionmaker" authority to

consent to medical treatment on behalf of an incompetent patient (*see* Reply at 1).

### A. *Language of the Agreement*

■ The Agreement permits Jasso, the resident, and a "Responsible Party acting on the Resident's behalf who has access to the Resident's income or resources" to enter into the Agreement with Defendant. Agreement at 1. Defendant alleges that Molina was, in fact, a "responsible party that was acting on behalf of her mother, Helen Jasso," but gives no indication on the record that Molina had "access to the Resident's income or resources." *See* Def.'s Br. at 2. On the other hand, Plaintiffs submitted affidavits stating that Molina did not have access to Jasso's finances and was not financially responsible for Jasso at the time she signed the Agreement and the Arbitration Provision. *See* Pl.'s Ex. 2 ("Molina's Aff.") (Clerk's No. 7-2) ¶ 9; Pl.'s Ex. 3 ("Terronez's Aff.") (Clerk's No. 7-3) ¶ 10. Because the plain language of the Agreement provides that a "Responsible Party" is one who "has access to the Resident's income or resources," and because there is no evidence that Molina fits that definition, the Court cannot conclude that Molina is a responsible party as contemplated by the Agreement.[2]

### B. *Apparent Authority*

■ In resisting Defendant's Motion, Plaintiffs cite four cases in support of their argument that Molina did not have the requisite authority to accept the Arbitration Provision on Jasso's behalf. *See* Resistance at 4–5. Three of these cases[3] saw their respective courts reject a defendant

nursing home's motion to compel arbitration on grounds that the defendant could not prove that the admitted resident was a third-party beneficiary. *See GGNSC Omaha Oak Grove, LLC v. Payich,* 708 F.3d 1024 (8th Cir.2013); *GGNSC Batesville, LLC v. Johnson,* 109 So.3d 562 (Miss. 2013); *Adams Cmty. Care Ctr., LLC v. Reed,* 37 So.3d 1155 (Miss.2010). In all three cases, the deciding courts concluded that the family member signing the admission agreement (and the arbitration provision contained therein) lacked authority to contract on the admitted resident's behalf, thus precluding a finding that the resident was a third-party beneficiary bound by the agreement. *See, e.g., Johnson,* 109 So.3d at 565 ("For a third-party beneficiary to exist, a valid contract must first exist.").

In *Payich,* the Eighth Circuit, applying Nebraska law, found that a resident's son could not bind the resident to the admission and arbitration agreements because both agreements named only the defendant and the resident as contracting parties, which suggested that "on the face of the Agreement, the parties intended only the Center and the resident or the resident's representative to enter the contract." *Payich,* 708 F.3d at 1027. Because the defendant had abandoned its argument that the son was the resident's representative, the court did not consider the issue. *Id.* Unlike *Payich, Johnson* involved a question of agency. Indeed, applying agency principles, the Mississippi Supreme Court concluded that there was insufficient evidence to hold that the resident's sister had apparent authority to

---

2. Notably, in addition to responsible parties, the Agreement also refers to "any other person signing this Agreement." *See* Agreement at 1. However, this language does not appear in the sentence that defines the parties who "hereby enter[ ] into this Agreement." *See id.* Therefore, the "any other person" language cannot be interpreted to imply that someone, for instance Molina, who is not a "spouse,

legal guardian, conservator, agent/attorney-in-fact or Responsible Party," could enter into the Agreement on Jasso's behalf.

3. The fourth case cited by Plaintiffs, *Koricic v. Beverly Enterprises–Neb., Inc.,* 278 Neb. 713, 773 N.W.2d 145 (2009), appears in the "surrogate decisionmaker" discussion below.

sign an arbitration agreement as the resident's representative. *See Johnson,* 109 So.3d at 567. The Mississippi Supreme Court decided *Reed* on similar grounds to *Johnson,* applying principal-agent analysis to conclude that the resident's son did not have the apparent authority to bind the resident to an arbitration agreement. *See Reed,* 37 So.3d at 1160.

 These cases suggest that a family member must possess apparent authority to sign an arbitration agreement on a resident's behalf. With this framework in mind, the Court now turns to Iowa law to resolve the issue in this case—whether the Arbitration Provision signed by Molina on Jasso's behalf is valid. *See Lyster,* 239 F.3d at 946 ("State contract law governs whether an arbitration agreement is valid."). Under Iowa law, a party's apparent authority to act on behalf of a principal "depend[s] on the particular facts, and no rules of uniform application can be stated." *Waukon Auto Supply v. Farmers & Merchs. Sav. Bank,* 440 N.W.2d 844, 847 (Iowa 1989) (quoting *Right of Check Owner to Recover Against One Cashing It on Forged or Unauthorized Indorsement and Procuring Payment by Drawee,* 100 A.L.R.2d 670, 682 (1965)). The existence of an agency relationship founded on apparent authority is "determined by the principal's actions, rather than the acts of the agent." *Wilkins v. Marshalltown Med. & Surgical Ctr.,* 758 N.W.2d 232, 236 (Iowa 2008). The burden of showing that a party had apparent authority to act as the principal's agent belongs to the party claiming that such authority existed. *Waukon Auto Supply,* 440 N.W.2d at 847 (citing *Grismore v. Consol. Prods. Co.,* 232 Iowa 328, 5 N.W.2d 646, 651 (1942)).

Defendant has not offered any evidence suggesting that Molina had apparent authority to sign the Arbitration Provision on Jasso's behalf. Because Defendant has not met its burden in this regard, the Court must conclude that Molina had no such authority to bind Jasso to the Arbitration Provision.

## C. *Surrogate Decisionmaker*

 In support of its contention that Molina had authority to accept the Arbitration Provision, Defendant argues that Molina was Jasso's surrogate decisionmaker and that, by signing the Agreement and the Arbitration Provision, Molina made a substituted judgment on Jasso's behalf. *See* Reply at 1. Where a patient's incompetence interferes with his or her ability to consent to a course of treatment, health care personnel may satisfy their duty to obtain the patient's consent by securing a substituted judgment. *Morgan v. Olds,* 417 N.W.2d 232, 236 (Iowa Ct.App. 1987). The "substituted judgment" stands in for the incompetent patient's right "to exercise control over his or her body … regarding the course of medical treatment." *Id.* at 235. The party making a substituted judgment on the incompetent patient's behalf is generally a family member and is referred to as the incompetent person's "surrogate decisionmaker." *Id.* at 236. In total, then, *Morgan* defines three elements of the surrogate decisionmaker authority: (1) the incompetence of the person requiring a substituted judgment; (2) a decision pertaining to a "course of medical treatment"; and (3) a family member to act as the surrogate decisionmaker. *See id.* at 235–36.

In this case, both parties agree that Jasso was incompetent to admit herself into Defendant's facility "due to weakness and confusion." *See* Resistance at 2; Reply at 2. Likewise, there is no dispute that Molina was Jasso's daughter. However, Jasso's incompetence and Molina's status as Jasso's family member comprise only two of the three elements of *Morgan's* surrogate decisionmaker authority. The remaining element requires the Court to

decide whether the Arbitration Provision is a decision pertaining to a "course of medical treatment." Because the Arbitration Provision explicitly states that it "is not a condition of admission or of continued stay" at Defendant's facility, it appears on its face to be separate from the treatment-related provisions listed elsewhere in the Agreement. *See* Agreement at 14.

Defendant argues, however, that Molina retained authority as a surrogate decisionmaker to consent to the Arbitration Provision. In support of this argument, Defendant cites to a Michigan case, *Edwards v. St. Mary's Hospital*, 135 Mich.App. 753, 356 N.W.2d 255 (1984), which held that a comatose patient's husband was permitted to revoke an arbitration agreement that the patient had signed prior to entering the coma. *See id.* at 257. In *Edwards*, the Michigan Court of Appeals applied Michigan's then-existing malpractice arbitration statute, requiring arbitration in all malpractice disputes where a patient signed an arbitration form when admitted for treatment, unless the "person receiving health care ... or his legal representative ... revoke[s] the [arbitration] agreement." *Id.* To decide whether the patient's husband had authority to revoke the arbitration agreement on his wife's behalf, the court considered whether he was her "legal representative" under the statute. *Id.* The Michigan Court of Appeals interpreted the "legal representative" language to refer to "all persons who, with respect to [the deceased's] property, stand in his place and represent his interests, whether transferred to them by acts or by operation of law." *Id.* (quoting *Mut. Life Ins. Co. of N.Y. v. Armstrong*, 117 U.S. 591, 597, 6 S.Ct. 877, 29 L.Ed. 997 (1886)). Because the husband "look[ed] out for his wife's business and best interests" during her coma, the court concluded that he was her legal representative and possessed authority to revoke the arbitration agreement under the Michigan statute. *Id.*

Defendant relies on *Edwards* for the proposition that "a surrogate decisionmaker, absent judicial adjudication, has the power to consent to arbitration or revoke such consent on behalf of the incompetent patient." Reply at 3. The Court disagrees. In *Edwards*, although the comatose patient's husband was both her surrogate decisionmaker *and* legal representative, his authority to revoke the arbitration agreement stemmed solely from his legal representative status, per Michigan statute. *See Edwards*, 356 N.W.2d at 257 ("The precise legal issue in this case is the definition of the words 'legal representative' as used in the Michigan medical malpractice statute."). The Supreme Court of the United States supplied the "legal representative" definition used by the Michigan Court of Appeals. *Id.* Under this definition, legal representatives must represent the deceased's or the incompetent person's property and interests "whether transferred to them by [the represented person's] acts or by operation of law." *Id.* (quoting *Armstrong*, 117 U.S. at 597, 6 S.Ct. 877). Defendant has shown neither that Jasso's acts nor an "operation of law" transferred Jasso's property and interests to Molina, and Molina's lack of access to Jasso's funds at the time of Jasso's admission to the facility, *see* Molina's Aff. ¶ 9 and Terronez's Aff. ¶ 10, indicates that there was no transfer of property and interests prior to Molina's signing of the Arbitration Provision. As such, the Court concludes that Molina was not Jasso's legal representative, despite acting as her surrogate decisionmaker in securing care-facility admission for Jasso.

Defendant next cites a California case, *Garrison v. Superior Court*, 132 Cal. App.4th 253, 33 Cal.Rptr.3d 350 (2nd Dist. 2005), in support of the proposition that arbitration agreements are contemplated by the health care-related decisions that surrogate decisionmakers are empowered

to make. *Garrison* did find that an adult child was capable of binding her mother to an arbitration agreement upon her admission to a care facility; however, the California Court of Appeals reached that conclusion due to the adult child's status as her mother's durable power of attorney. *See Garrison,* 132 Cal.App.4th at 265, 33 Cal.Rptr.3d 350. The adult child's role as durable power of attorney in *Garrison* distinguished the case from two other California cases that each found adult children who did *not* act as durable power of attorney were incapable of binding their parents to arbitration agreements.[4] *See id.* at 265–66, 33 Cal.Rptr.3d 350 (discussing *Pagarigan v. Libby Care Ctr., Inc.,* 99 Cal. App.4th 298, 120 Cal.Rptr.2d 892 (2nd Dist.2002) and *Goliger v. AMS Props., Inc.,* 123 Cal.App.4th 374, 19 Cal.Rptr.3d 819 (2nd Dist.2004)). Because there is no evidence that Molina was Jasso's durable power of attorney, *Garrison* is clearly distinguishable.

## III. CONCLUSION

After careful consideration, and for the reasons stated herein, the Court concludes that Molina's status as Jasso's surrogate decisionmaker authorized her to make decisions on Jasso's behalf only as those decisions related to medical treatment. Jasso's admission to Defendant's facility was within the scope of medical treatment encompassed by the surrogate decisionmaker's authority. However, because the Arbitration Provision was not a condition of Jasso's admission to the facility, and because Molina had no further legal authority to contract on Jasso's behalf beyond her status as a surrogate decisionmaker, she lacked authority to accept the terms of the Arbitration Provision. Accordingly, the Arbitration Provision of the Agreement between Plaintiffs and Defendant is invalid. Defendant's Motion to Dismiss or Stay the Proceedings and to Compel Arbitration (Clerk's No. 4) is DENIED.[5]

IT IS SO ORDERED.

---

**4.** Other jurisdictions have similarly held that a family member acting as a surrogate decisionmaker to admit a patient into a nursing facility—but not acting as durable power of attorney—lacks the authority to bind the patient to an arbitration provision. *See, e.g., Dickerson v. Longoria,* 414 Md. 419, 995 A.2d 721, 737 (Md.Ct.App.2010) ("The decision to sign a free-standing arbitration agreement is not a health care decision if the patient may receive health care without signing the arbitration agreement."); *Koricic v. Beverly Enters.-Neb., Inc.,* 278 Neb. 713, 773 N.W.2d 145, 150–51 (2009) (finding that a son with authority to sign medical documents for his mother lacked authority to sign an optional arbitration agreement attached to the nursing facility admission forms); *Lujan v. Life Care Ctrs. of Am.,* 222 P.3d 970, 973–74 (Colo.Ct. App.2009) (concluding that, even where an arbitration agreement is included in a nursing facility admission agreement, signing that arbitration agreement is not a medical treatment decision).

**5.** The Court need not reach the other issues raised by the parties, because they assume that the Agreement was valid.