Filed 8/7/15  Starling v. St. John of God Retirement &Care Center CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DORIS STARLING, as Personal Representative, etc., et al.,<br><br>        Plaintiffs and Respondents,<br><br>        v.<br><br>ST. JOHN OF GOD RETIREMENT & CARE CENTER,<br><br>        Defendant and Appellant. | B253064<br><br>(Los Angeles County<br>Super. Ct. No. BC517093) |

APPEAL from an order of the Superior Court of Los Angeles County, Daniel Buckley, Judge.  Affirmed.

Foley & Mansfield, Noelle M. Natoli-Duffy, Louis C. Klein and M. Amadea Groseclose for Defendant and Appellant.

Kristensen Weisberg, David Weisberg and John Kristensen for Plaintiffs and Respondents.

Defendant St. John of God Retirement & Care Center (St. John) appeals from the trial court's denial of its motion to compel arbitration of a civil action filed by the Estate of Ella McKennis, a former resident, against St. John. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In 2010, 96-year-old Ella McKennis fell and broke her femur. As a result, she moved from the home of her daughter, Doris Starling, to St. John's skilled nursing facility in Los Angeles.

As part of the admissions process, St. John's administration office provided Starling with a multi-page set of paperwork to review and sign. Included therein was a document entitled "California Standard Admission Agreement For Skilled Nursing Facilities and Intermediate Care Facilities" ("Admission Agreement"); a "Resident-Facility Arbitration Agreement" ("Arbitration Agreement"); and various consent and miscellaneous forms. As required by Health and Safety Code section 1599.81, the Arbitration Agreement was set forth on a separate one and one-half page form.

The Arbitration Agreement contained three signature lines: one for "resident representative," one for "resident," and one for "facility employee." Preceding the Arbitration Agreement's signature block was the following language: "The undersigned certifies that he/she has read this Agreement, and has been given a copy, and is either the Resident, or is the representative of the Resident, duly authorized to execute the above and accept its terms. [¶] NOTICE: BY SIGNING THIS CONTRACT, YOU ARE AGREEING TO HAVE ANY ISSUE OF MEDICAL MALPRCTICE DECIDED BY NEUTRAL ARBITRATION AND YOU ARE GIVING UP YOUR RIGHT TO A JURY OR COURT TRIAL. SEE ARTICLE I OF THIS CONTRACT." A second, similar signature block followed, regarding submission of monetary disputes, except collections and evictions, to arbitration.

The Arbitration Agreement bore the signature "Ella McKennis" on the "Resident's Signature" line, and "Doris Starling" on the "Resident Representative's Signature" line. Both signatures were dated December 10, 2010.

As relevant here, the Arbitration Agreement provided that any dispute between the resident and the facility for medical malpractice, negligence, tort, and statutory causes of action, would be submitted to arbitration as provided by California law, with arbitration to proceed pursuant to the Medical Arbitration Rules of the California Hospital Association – California Medical Association.[1]  It also stated that agreement to arbitrate was not a precondition for treatment or admission, and that the agreement was binding on "all parties, including their personal representative, successors, family members and heirs."

McKennis was apparently admitted to St. John's facility the same date the Admission Agreement and Arbitration Agreement were signed, December 10, 2010.

---

[1]     The relevant portions of the Arbitration Agreement provided:  "Article 1.  It is understood that any dispute as to medical malpractice, that is, as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process, except as California law provides for judicial review of arbitration proceedings.  Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.  [¶]  Article 2.  It is further understood that any dispute between Resident and Facility, including any action for injury or death arising from negligence, intentional tort and/or statutory causes of action (including all California Welfare and Institutions Code sections, but not including California Health & Safety Code § 1430 and/or California Administrative Code § 73527), will be determined by submission to arbitration as provided by California law, and not by lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings.  Resident and Facility, as parties to this agreement, are giving up their Constitutional rights to have a dispute under this agreement decided in a court of law before a jury, and instead are accepting the use of arbitration.  [¶]  Article 3.  Resident and Facility agree that any arbitration pursuant to this agreement will proceed according to the Medical Arbitration Rules of the California Hospital Association – California Medical Association (copies available at Facility Admissions Office).  [¶]  Article 4.  Agreement to arbitrate is not a precondition for medical treatment or for admission to the Facility.  [¶]  Article 5.  This Agreement shall be binding for any dispute except for disputes pertaining to collections or evictions within thirty (30) days of signature.  This Agreement may be rescinded by written notice within thirty (30) days of signature.  This Agreement is binding on all parties, including their personal representative, successors, family members and heirs."  (Boldface omitted.)

3

On February 14, 2012, McKennis and Starling executed a "Durable Power of Attorney for Management of Property and Personal Affairs" (the POA). The POA authorized Starling to make decisions regarding McKennis's health and real and personal property. As pertinent here, it empowered Starling to "take any actions she believes necessary or desirable with respect to any claim that I may have or that has been asserted against me and with respect to any legal proceeding in which I have an interest when this Power is executed, or in which I later acquire an interest," including the power to "submit any dispute in which I have an interest to arbitration."

According to McKennis, on August 30, 2012, a nurse working at St. John's facility administered the wrong medication to her, causing her to become comatose, requiring several days of hospitalization, and causing injury.

McKennis left the facility and was readmitted several days later. On September 6, 2012, Starling executed a "Resident Readmission Agreement" ("Readmission Agreement") on McKennis's behalf. It stated, in pertinent part: "This Readmission Agreement is a legally binding contract and incorporates herein all terms and conditions of the admission agreement. [¶] . . . [¶] 1. I certify that Ella McKennis was a resident at the facility and is returning to the facility after an absence not greater than thirty (30) days. [¶] 2. I certify that I have previously read and signed all terms and conditions listed in the admission agreement dated 12/10/10 and understand that by signing this agreement, I agree that the terms and conditions of said admission agreement remain in full force and effect and said terms and conditions shall be applicable and enforceable throughout the duration of the present stay at the facility. [¶] 3. I agree that all consents previously given to the facility are still valid and in full force and effect." A line in section 3, "Exceptions are:" was left blank.

4

On August 2, 2013, McKennis filed a complaint individually and by and through Starling, her guardian ad litem, against St. John and two other defendants[2] alleging negligence, negligence per se, negligent hiring, training and supervision, and unfair competition, arising out of the alleged August 30, 2012 medication error.

On October 11, 2013, St. John filed a motion to compel arbitration of McKennis's claims and to stay the trial court proceedings, based on the December 10, 2010 arbitration agreement.

McKennis opposed the motion. In support of the opposition, Starling filed a declaration stating that she had signed her mother's name on the Arbitration Agreement's "Resident's Signature" line; McKennis was not present when Starling signed the Arbitration Agreement; McKennis never signed the Arbitration Agreement, nor did Starling show it to her, read it to her, or explain it to her; the Arbitration Agreement was "buried" within approximately 20 sheets of admissions paperwork; and Starling felt as if she had no choice but to sign "all of the paperwork" in order for McKennis to become a resident. When Starling signed the Arbitration Agreement, McKennis had not yet executed a POA. McKennis argued that because she did not sign the Arbitration Agreement, and had not executed the POA at the time Starling signed it, it did not bind her. She also urged that the Arbitration Agreement was unconscionable; failed to comply with Health and Safety Code section 1599.81; and there was a possibility of inconsistent rulings if the motion to compel arbitration was granted.

In reply, St. John countered that Starling's execution of the Readmission Agreement, after McKennis had executed the POA, ratified the Arbitration Agreement and cured any deficiency therein; the agreement was not unconscionable and complied with Health and Safety Code section 1599.81; and discounted the risk of inconsistent rulings.

---

[2]    The record does not include a copy of the complaint. However, Respondents state that the complaint also named as defendants the nurse alleged to have administered the incorrect medication, and the medical staffing company that allegedly employed her. Neither is a party to this appeal.

5

On December 3, 2013, the trial court denied St. John's motion. In a written ruling, the court reasoned that *Pagarigan v. Libby Care Center, Inc.* (2002) 99 Cal.App.4th 298 (*Pagarigan*), which held that an arbitration agreement could not be enforced when an elderly patient's adult children signed on the resident's behalf without express authorization, was "directly on point." The court found St. John had failed to show that Starling's subsequent signature on the Readmission Agreement satisfied the requirement that McKennis or her authorized agent actually sign the Arbitration Agreement. The court reasoned: "The problem with [St. John's] argument is that the readmission agreement references a prior 'admission agreement,' but does not reference the prior 'Resident-Facility Arbitration Agreement.' " Furthermore, "even if the agreement were referenced," St. John had failed to address whether Starling's signature on the Readmission Agreement would satisfy the requirements of Health and Safety Code section 1599.81. The court did not reach the additional arguments raised by the parties.

On December 11, 2013, St. John filed a notice of appeal challenging the trial court's ruling.

McKennis died on March 19, 2014. Starling was appointed as the representative of McKennis's Estate, and to act as McKennis's successor in interest.

**CONTENTIONS**

Appellant St. John argues that respondent, the Estate of McKennis by and through Starling and Willie McKennis, the successors in interest to the Estate (hereinafter Respondents), must be compelled to arbitrate because (1) Starling "ratified the signed Arbitration Clause through the Readmission Agreement"; (2) Respondents are equitably estopped from refusing to arbitrate; (3) it is against public policy to allow Starling to "commit fraud" in order to escape arbitration; and (4) *Pagarigan* and its progeny are legally and factually distinguishable from the instant matter.

6

Respondents counter that the December 10, 2010 Arbitration Agreement is invalid because McKennis did not sign it; when Starling signed it, the POA was not yet in effect; even if the agreement is deemed binding, the motion was properly denied because the agreement is unconscionable; and grant of the motion could lead to inconsistent rulings "based on the presence of the other defendants . . . who are not parties to the arbitration agreement."

## DISCUSSION

1. *Applicable legal principles*

An order denying a motion to compel arbitration is appealable. (Code Civ. Proc., § 1294, subd. (a); *Valentine Capital Asset Management, Inc. v. Agahi* (2009) 174 Cal.App.4th 606, 612, fn. 5.) If the facts are undisputed, we independently review the record to determine whether a valid arbitration agreement exists. (*Flores v. Evergreen at San Diego, LLC* (2007) 148 Cal.App.4th 581, 586 (*Flores*); *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1127-1128 (*Young*); *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, 263.) Insofar as the trial court's order is based on findings of material fact, we apply a substantial evidence standard. (*Young, supra,* at p. 1127.) We "apply general California contract law to determine whether the parties formed a valid agreement to arbitrate." (*Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 89; *Garrison, supra,* at p. 263.) Here, because the trial court's decision rested on undisputed facts, we independently review its ruling.

The " 'right to compel arbitration depends upon the existence of a valid agreement to arbitrate between the parties.' " (*Garrison v. Superior Court, supra,* 132 Cal.App.4th at p. 263; *Sky Sports, Inc. v. Superior Court* (2011) 201 Cal.App.4th 1363, 1368; *Young, supra,* 220 Cal.App.4th at p. 1128.) A party cannot be compelled to arbitrate a dispute that it has not elected to submit to arbitration. (*Sky Sports, Inc. v. Superior Court, supra,* at p. 1367; *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 59.) A person authorized to act as a patient's agent can bind the patient to an arbitration

7

agreement.  (*Goldman v. Sunbridge Healthcare, LLC* (2013) 220 Cal.App.4th 1160, 1169; *Young, supra,* at p. 1128; *Garrison v. Superior Court,* at p. 264.)

Code of Civil Procedure section 1281.2 sets forth the procedure to compel arbitration.[3]  "On petition of a party to an arbitration agreement alleging the existence of a written agreement to arbitrate a controversy and that a party thereto refuses to arbitrate such controversy, the court shall order the petitioner and the respondent to arbitrate the controversy" unless the petitioner has waived the right to compel arbitration, or grounds for revocation exist.  (Code Civ. Proc., § 1281.2; *Sky Sports, Inc. v. Superior Court, supra,* 201 Cal.App.4th at p. 1367.)  The party seeking to compel arbitration has the initial burden to prove the existence of a valid arbitration agreement by a preponderance of the evidence.  (*Young, supra,* 220 Cal.App.4th at p. 1128; *Flores, supra,* 148 Cal.App.4th at p. 586; *Villacreses v. Molinari* (2005) 132 Cal.App.4th 1223, 1230.)  " 'Once that burden is satisfied, the party opposing arbitration must prove by a preponderance of the evidence any defense to the petition.  [Citations.]' "  (*Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at p. 59; *Villacreses, supra,* at p. 1230.)

California has a strong policy favoring arbitration.  (*Young, supra,* 220 Cal.App.4th at p. 1128; *Molecular Analytical Systems v. Ciphergen Biosystems, Inc.* (2010) 186 Cal.App.4th 696, 704; *Villacreses v. Molinari, supra,* 132 Cal.App.4th at p. 1229.)  However, " '[e]ven the strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement or who have not authorized anyone to act for them in executing such an agreement.' "  (*Young, supra,* at p. 1128; *Garrison v. Superior Court, supra,* 132 Cal.App.4th at pp. 263-264; *Sky Sports, Inc. v. Superior Court, supra,* 201 Cal.App.4th at p. 1367.)

---

[3]  Petitions to compel arbitration are generally " 'resolved by a summary procedure that allows the parties to submit declarations and other documentary testimony and, at the trial court's discretion, to provide oral testimony.' "  (*Warfield v. Summerville Senior Living, Inc.* (2007) 158 Cal.App.4th 443, 446; *Flores, supra,* 148 Cal.App.4th at p. 586.)

California law contains a "detailed and comprehensive statutory scheme governing nursing homes," including "a series of provisions permitting arbitration provisions in nursing home contracts but imposing rigorous disclosure requirements and excluding certain claims from arbitration coverage." (*Flores, supra,* 148 Cal.App.4th at p. 590.) For example, when a patient is admitted to a skilled nursing facility, the patient or his or her representative must sign a standardized admission agreement. (Health & Saf. Code, § 1599.61, subd. (a); *Flores, supra,* at p. 585.) Health and Safety Code section 1599.60 et seq. addresses the legal requirements for admission contracts for long term health care facilities. (*Hogan v. Country Villa Health Services* (2007) 148 Cal.App.4th 259, 267.) Health and Safety Code section 1599.81 "addresses arbitration clauses used in contracts of admission and provides certain requirements for the form and content of the same." (*Hogan, supra,* at p. 267.) As pertinent here, section 1599.81 requires that all arbitration clauses in an admission contract must be "included on a form separate from the rest of the admission contract" and "shall contain space for the signature of any applicant who agrees to arbitration of disputes."

2. *The December 2010 arbitration agreement is invalid because McKennis did not sign it and there was no power of attorney in effect when Starling signed it.*

The Arbitration Agreement, standing alone, was not valid because it was neither signed by the principal, McKennis, nor by a person legally authorized, at the time, to act on her behalf. In the nursing facility setting, an arbitration agreement signed by a resident's relative is not binding on the resident unless the resident has previously signed a durable power of attorney giving the relative legal authority to act on the resident's behalf. At the time Starling signed the Arbitration Agreement, McKennis had not yet executed a power of attorney. Therefore, Starling had no power to bind McKennis to the agreement.

As the trial court found, several authorities compel this conclusion. In *Pagarigan, supra,* 99 Cal.App.4th 298, a comatose patient was admitted to a skilled nursing facility, and a week later her two daughters executed arbitration agreements, signing their own names. The daughters and their brother subsequently sued the facility for negligence and

9

other claims arising from the mother's death.  The arbitration agreements were held to be invalid because the facility failed to produce any evidence the daughters had authority to enter into an arbitration contract on behalf of their mother.  (*Id.* at pp. 300-301.)  The court reasoned:  "Defendants bore the burden of establishing a valid agreement to arbitrate.  Defendants admit [the mother] did not sign either arbitration agreement.  They further admit [she] was mentally incompetent at the time she was admitted . . . and at the time her daughters signed the arbitration agreements . . . .  There was no evidence Ms. Pagarigan had signed a durable power of attorney.  It necessarily follows Ms. Pagarigan lacked the capacity to authorize either daughter to enter into the arbitration agreements on her behalf.  Consequently no valid arbitration contract exists."  (*Id.* at p. 301, fn. omitted.)

The court rejected the argument that the agreements were enforceable because the signatures on the agreements proved the daughters " 'represented themselves as having the power to bind' " the mother.  (*Pagarigan*, *supra*, 99 Cal.App.4th at p. 301.) *Pagarigan* explained:  "This may be true but it is totally irrelevant.  A person cannot become the agent of another merely by representing herself as such.  To be an agent she must actually be so employed by the principal or 'the *principal* intentionally, or by want of ordinary care, [has caused] a third person to believe another to be his agent who is not really employed by him.'  Defendants produced no evidence Ms. Pagarigan had ever employed either of her daughters as her agent in any capacity.  Nor did defendants produce any evidence this comatose and mentally incompetent woman did anything which caused them to believe either of her daughters was authorized to act as her agent in any capacity."  (*Id.* at pp. 301-302, fns. omitted.)  The court further reasoned that the daughters' status as next of kin and their admitted authority to make medical decisions for their mother did not authorize them to execute an arbitration agreement on their mother's behalf.  (*Id.* at pp. 302-303.)

In *Goliger v. AMS Properties, Inc.* (2004) 123 Cal.App.4th 374, an adult daughter filled out her parent's admission papers to a nursing facility, including two arbitration agreements.  The daughter signed her own name on a signature line marked "responsible

10

party," and left a line marked "agent" blank. (*Id.* at pp. 375-376.) In accord with *Pagarigan,* the court held the daughter could not bind the parent to the arbitration clause. (*Goliger, supra,* at pp. 376-377.) Unlike the comatose patient in *Pagarigan,* the patient in *Goliger* was mentally alert and consented to her daughter making health care decisions for her. However, this was a distinction without a difference: allowing the daughter to make health care decisions did not translate into authority to agree to arbitration, and did "not equate with being an agent empowered to waive the constitutional right of trial by jury." (*Id.* at p. 377.)

In *Flores, supra,* 148 Cal.App.4th 581, a husband signed various admission documents, including two arbitration agreements, when his wife was admitted to the defendant's skilled nursing facility. (*Id.* at p. 585.) At the time, the husband did not have a power of attorney to act for his wife, who suffered from dementia, nor had he been declared her conservator or guardian. Nine months after her admission, the wife signed a power of attorney giving the husband authority over claims and litigation. (*Ibid.*) The nursing facility's motion to compel arbitration of a civil claim later filed by the couple was properly denied. Absent a legislative directive, the spousal relationship alone was insufficient to confer authority to agree to an arbitration provision in a nursing home admission contract. (*Id.* at pp. 586-587.) Furthermore, and more significant for our purposes here, the court rejected the notion that the arbitration agreement should be upheld because the husband had represented himself as his wife's agent. (*Id.* at p. 589.) The wife did not sign the arbitration agreements, and at the time the husband signed them, he did not have a power of attorney authorizing him to act as the wife's agent. (*Id.* at p. 587.) Neither the fact he signed the admission documents nor the wife's subsequent execution of the power of attorney was sufficient. (*Id.* at pp. 588-589; see also *Goldman v. Sunbridge Healthcare, LLC, supra,* 220 Cal.App.4th at p. 1173; *Warfield v. Summerville Senior Living, Inc., supra,* 158 Cal.App.4th at p. 445 [husband lacked authority to sign arbitration agreement for his wife]; *Young, supra,* 220 Cal.App.4th at pp. 1128-1129.)

11

Thus, as in the foregoing cases, the Arbitration Agreement, at least as executed in December 2010, was invalid.

St. John urges that *Pagarigan* and its progeny are inapplicable, because in those cases, the relatives signed their own names to the arbitration agreements and held themselves out as the residents' agents, whereas here, Starling signed – or "forged," as St. John characterizes it – McKennis's name. In St. John's view, the legal issue in the *Pagarigan* line of cases was "one of agency – i.e. whether a purported agent had actual or ostensible authority to bind a principal to an arbitration agreement." St. John contends that because it was unaware McKennis was not the actual signatory, it had no notice of a purported agency relationship, and no obligation to inquire whether Starling had authority to bind McKennis. Had St. John known McKennis did not sign the agreement, it would have taken the required step of obtaining proof of agency. Thus, St. John argues, "no *Pagarigan* facts exist that would require a finding that the arbitration agreement is not legally binding and enforceable."

We are not persuaded. *Pagarigan* and similar cases are not irrelevant. To the extent St. John avers the Arbitration Agreement, as signed in December 2010, was valid and binding, the foregoing authorities clearly stand for opposite proposition. We do not discern legal significance in the fact that Starling signed her mother's name. As *Pagarigan* explained, a "person cannot become the agent of another merely by representing herself as such." (*Pagarigan, supra,* 99 Cal.App.4th at p. 301.) St. John does not persuasively explain how a person can become another's agent by "forging" the principal's name, at least absent ratification by the principal. If this theory were accepted, a forger could bind an unknowing and unwilling principal, if only the other party to the ostensible arbitration agreement lacked notice. That St. John was not on notice that the signature was actually Starling's cannot somehow give rise to an agency relationship. "To be an agent [one] must actually be so employed by the principal or 'the *principal* intentionally, or by want of ordinary care, [has caused] a third person to believe another to be his agent who is not really employed by him.' " (*Id.* at pp. 301-302, fn. omitted.) The record is devoid of evidence that McKennis did anything to cause St. John

12

to believe she had personally signed the Arbitration Agreement, or that Starling was her agent in December 2010.

   3.  *The Readmission Agreement*

   We agree, however, that on the facts of this case the question does not end with *Pagarigan*, given Starling's subsequent execution of the Readmission Agreement after the POA was in place.  The parties do not appear to dispute that, had Starling signed the Arbitration Agreement *after* McKennis executed the POA, it would have been enforceable.  (See *Young, supra,* 220 Cal.App.4th at p. 1128 [a person who is authorized to act as the patient's agent can bind the patient to an arbitration agreement]; *Garrison v. Superior Court, supra,* 132 Cal.App.4th at p. 264; *Flores, supra,* 148 Cal.App.4th at p. 587; cf. *Hogan v. Country Villa Health Services, supra,* 148 Cal.App.4th at p. 262.)  We therefore turn to St. John's primary argument:  that Starling's execution of the Readmission Agreement, after the POA was in place, ratified the agreement to the Arbitration Agreement and cured any defects in the original agreement.

   The threshold question posed by the parties relevant to this issue is whether the Arbitration Agreement was part of the Admission Agreement, or whether the Arbitration Agreement was a separate document.  The Readmission Agreement purported to reaffirm only the "terms and conditions" of the "admission agreement" and "consents previously given."  Therefore, Starling's execution of the Readmission Agreement is relevant to the validity of the Arbitration Agreement, if at all, only if the Arbitration Agreement was part of the Admission Agreement.  The parties set forth a variety of arguments in support of their respective positions.

   a.  *Health and Safety Code sections 1599.60 and 1599.81 do not compel the conclusion that the Admission Agreement and Arbitration Agreement were separate documents.*

   Respondents posit that the two agreements were, by law, separate contracts.  Her argument runs as follows.  Health and Safety Code section 1599.60, subdivision (b) provides:  " 'Contract of admission' includes all documents which a resident or his or her representative must sign at the time of, or as a condition of, admission to a long-term

13

health care facility, as defined in Section 1326." They interpret this provision to mean that *only* those documents which *must* be signed at the time of admission may be considered part of the contract. Health and Safety Code section 1599.81, subdivision (a) requires that "[a]ll contracts of admission that contain an arbitration clause shall clearly indicate that agreement to arbitration is not a precondition for medical treatment or for admission to the facility." Therefore, Respondents reason, an arbitration agreement is not a required document and cannot be a part of the contract of admission.

Respondents also point to the following language in *Flores, supra,* 148 Cal.App.4th 581: "Because arbitration agreements waive important legal rights, the Legislature has imposed heightened requirements on arbitration provisions in nursing home contracts. Notably, *the Legislature has required that arbitration agreements be separate from the rest of the admission contract and contain separate signatures.* Thus, when a family member signs an admission agreement, this signature cannot by law also cover an arbitration agreement." (*Id.* at p. 594, italics added.) Respondents reason that if an arbitration agreement must be separate from an admission agreement, "it is axiomatic that an arbitration agreement must also be separate from a readmission agreement."

We disagree with Respondents' interpretation. When construing a statute, we begin with the plain, commonsense meaning of the language used by the Legislature. (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 630.) Health and Safety Code section 1599.81 provides as follows: "(a) All *contracts of admission that contain an arbitration clause* shall clearly indicate that agreement to arbitration is not a precondition for medical treatment or for admission to the facility. [¶] (b) All *arbitration clauses shall be included on a form separate from the rest of the admission contract.* This attachment shall contain space for the signature of any applicant who agrees to arbitration of disputes. [¶] (c) On the attachments, *clauses referring to arbitration of medical malpractice claims,* as provided for under Section 1295 of the Code of Civil Procedure*, shall be clearly separated from other arbitration clauses*, and separate signatures shall be required for each clause. [¶] (d) *In the event the contract contains an arbitration clause*, the contract attachment pertaining to arbitration shall contain notice

14

that under Section 1430, the patient may not waive his or her ability to sue for violation of the Patient's Bill of Rights." (Italics added.)

This statutory language is not ambiguous: it clearly contemplates that an admission agreement may contain an arbitration clause. The statute speaks in terms of separate clauses, not separate agreements. The first sentence of Health and Safety Code section 1599.81, subdivision (a) expressly allows that arbitration provisions may be part of the admissions contract, in that it references "[a]ll *contracts of admission that contain an arbitration clause.*" (Italics added.) This language, as well as the other portions of the statute italicized *ante,* require rejection of Respondents' contention. That the statute mandates that arbitration clauses be on a separate page, and be signed separately, does not mean they are necessarily excluded from the admission contract. In short, Respondents' argument is foreclosed by the plain statutory language. As one court has noted, "The statutory framework . . . sanctions the use, in contracts of admission, of arbitration clauses meeting" the requirements of Health and Safety Code section 1599.81. (*Hogan v. Country Villa Health Services, supra,* 148 Cal.App.4th at p. 267.) Further, Health and Safety Code section 1599.60, subdivision (b) does not suggest that an admission contract is limited to required documents. Instead, the word "includes" appears to be used in the permissive, rather than exclusive, sense. If there was any doubt on this point, it is settled by the express language of Health and Safety Code section 1599.81.

As for the language cited from *Flores,* it is apparent the court there was simply making the point that pursuant to Health and Safety Code section 1599.81, an arbitration clause must bear a separate signature and must be set forth on a separate form, in order to ensure the arbitration agreement is obtained with the party's informed consent. (*Flores, supra,* 148 Cal.App.4th at pp. 591, 594.) Elsewhere in *Flores* the court referred to "*an arbitration provision in a nursing home admission contract*" (*id.* at p. 587, italics added), and the opinion does not stand for the proposition that an arbitration agreement and an admission contract must, by law, be separate documents.

15

b. *The parties' other arguments*

St. John, for its part, argues that the "arbitration clause" is part of the Admission Agreement between the parties. It points to Civil Code section 1642, which provides: "Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (See, e.g., *Reigelsperger v. Siller* (2007) 40 Cal.4th 574, 580; *Nevin v. Salk* (1975) 45 Cal.App.3d 331, 338 ["Under section 1642 of the Civil Code, it is the general rule that several papers relating to the same subject matter and executed as parts of substantially one transaction, are to be construed together as one contract"]; *Freedland v. Greco* (1955) 45 Cal.2d 462, 468; *Cadigan v. American Trust Co.* (1955) 131 Cal.App.2d 780, 782.) Here, the Arbitration Agreement and the Admission Agreement were both contained in the packet of paperwork given to Starling; she signed all the documents on the same date; and all pertained to the same event, McKennis's admission to the facility. The fact that the Arbitration Agreement was contained on separate pages lacks significance, St. John urges, because pursuant to Health and Safety Code section 1599.81, subdivision (b), an arbitration clause is required to be so formatted.

The parties also devote considerable analysis to the question of whether the Readmission Agreement incorporated the Arbitration Agreement by reference. " ' " ' "It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document. [Citations.] But each case must turn on its facts. [Citation.] For the terms of another document to be incorporated into the document executed by the parties the reference must be clear and unequivocal, the reference must be called to the attention of the other party and he must consent thereto, and the terms of the incorporated document must be known or easily available to the contracting parties." ' [Citations.]" [Citation.]' [Citation.] 'The contract need not recite that it "incorporates" another document, so long as it "guide[s] the reader to the incorporated document." [Citations.]' [Citation.]" (*Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at p. 66; *Wolschlager v. Fidelity National Title*

16

*Ins. Co.* (2003) 111 Cal.App.4th 784, 790; *Chan v. Drexel Burnham Lambert, Inc.* (1986) 178 Cal.App.3d 632, 641.)

Respondents argue there was no incorporation by reference because the Readmission Agreement did not clearly and unequivocally reference the Arbitration Agreement; indeed, it never expressly mentioned arbitration or named the Arbitration Agreement. Respondents cite *Chan v. Drexel Burnham Lambert, Inc., supra,* 178 Cal.App.3d 632, in which this court held an arbitration clause was not incorporated by reference. In *Chan,* a stockbroker, as a condition of her employment with a brokerage firm, signed a "U-4" application concerning her registration as a securities broker and submitted it to the New York Stock Exchange (NYSE). (*Id.* at pp. 635-636.) By signing the U-4 Chan agreed to be bound by the rules of any organization to which the application was submitted, and the NYSE had a rule requiring arbitration of controversies arising out of a broker's termination from a member brokerage firm. We held that the arbitration provision was not incorporated by reference into the U-4 agreement, because the relevant portion of the U-4 did not mention arbitration, did not identify any document or source by title, and did not guide the reader to the incorporated document. (*Id.* at pp. 643-645.) Respondents argue that, as in *Chan,* the Readmission Agreement does not refer to the Arbitration Agreement by title and does not guide the reader to it.

St. John distinguishes *Chan* on the basis that there, the employee did not sign an arbitration agreement and had to seek out the NYSE rule to locate the arbitration clause, whereas here Starling actually signed the Arbitration Agreement, which was readily available to her. St. John instead focuses on *King v. Larsen Realty, Inc.* (1981) 121 Cal.App.3d 349, 357, in which the court held an arbitration provision in the bylaws of a real estate board had been incorporated into realtors' membership agreements, and *Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at page 66, in

17

which employees were held to have agreed to one version of an arbitration agreement by signing various employment documents.[4]

      c. *The Readmission Agreement cannot ratify a term that did not exist*

      We need not decide whether the Arbitration Agreement form was part of the Admission Agreement or was incorporated by reference, however, because even assuming arguendo it was, St. John's contention -- that Starling, on McKennis's behalf, agreed to arbitration by signing the Readmission Agreement -- fails. The Readmission Agreement states: "I certify that I have previously read and signed all terms and conditions listed in the admission agreement dated 12/10/10 and understand that by signing this agreement, I agree that the terms and conditions of said admission agreement *remain in full force and effect* an*d said terms and conditions shall be applicable and enforceable* throughout the duration of the present stay at the facility." (Italics added.) St. John argues: "the 2012 Readmission Agreement clearly and unequivocally incorporates by reference all terms and conditions that were part of the 2010 admission contract." But therein lies the rub: the arbitration provision was *not* part of the 2010 contract. As we have discussed, the December 2010 arbitration clause was not valid; therefore, there was no arbitration agreement that could have "remain[ed] in full force and effect." The agreement to arbitrate could not, and did not, become one of the terms and conditions of the contract because Starling lacked authority to agree to arbitration. Starling's signature on the Readmission Agreement cannot have affirmed the continued existence of a term that never came to be; she cannot have ratified something that did not exist. If, for example, the Arbitration Agreement had never been executed by anyone, it

---

[4]    *Avery* nonetheless affirmed the trial court's denial of the employer's motion to compel arbitration because, inter alia, "the incomplete and confusing patchwork of documents [the employer] submitted" prevented the court from finding an enforceable arbitration agreement. (*Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at p. 71.)

18

would not make sense to argue that the readmission agreement brought it to life. For all practical purposes, the same is true here.[5]

Nor can we conclude that McKennis "agreed to arbitrate her claims through ratification of her agent's conduct through the Readmission Agreement," as St. John claims. "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which . . . is to treat the act as if originally authorized by him." (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73.) St. John points to several authorities, all arising in a context quite different than that present here, for the proposition that a principal may ratify his signature forged by his agent, and the ratification will relate back to the time the forgery was made. (See, e.g., *Navrides v. Zurich Ins. Co.* (1971) 5 Cal.3d 698, 703-704; *Ballard v. Nye* (1903) 138 Cal. 588, 596-597; *Common Wealth Ins., Systems, Inc. v. Kersten* (1974) 40 Cal.App.3d 1014, 1024-1025; *Crittenden v. McCloud* (1951) 106 Cal.App.2d 42, 49-50; cf. *Merry v. Garibaldi* (1941) 48 Cal.App.2d 397; see also Civ. Code, § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification."].) The problem with this argument is that there is no evidence in the record suggesting McKennis ever expressly, or by implication, ratified the Arbitration Agreement. "A purported agent's act may be adopted expressly or it may be adopted by implication based on conduct of the purported principal from which an intention to consent to or adopt the act may be fairly inferred, including conduct which is 'inconsistent with any reasonable intention on his part, other than that

---

[5] Respondents urge that the Readmission Agreement could not have established a valid agreement to arbitrate because it did not comply with the dictates of Health and Safety Code section 1599.81. They point out that, inter alia, the Readmission Agreement failed to advise that an agreement to arbitrate is not a precondition for admission; was not set forth on a separate form; and was not separately signed. Therefore, they contend, enforcing an arbitration agreement without statutory compliance would violate public policy and contravene the Legislature's intent. However, in light of our conclusion we need not reach these arguments, nor need we address St. John's contention that Respondents' argument on this point is preempted by the Federal Arbitration Act.

19

he intended approving and adopting it.' [Citations.]" (*Rakestraw v. Rodrigues, supra,* at p. 73.)  No such evidence exists here.

*Flores, supra,* 148 Cal.App.4th 581, is instructive.  There, a skilled nursing facility argued an agency relationship should be implied because the patient, Josephina, had allowed the facility to believe her husband, Luis, had the authority to act for her.  (*Id.* at p. 588.)  The court explained:  "[A]n agency cannot be created by the conduct of the agent alone; rather *conduct by the principal* is essential to create the agency."  (*Ibid.*)  Although defendant Evergreen presented evidence that Luis acted as if he were Josephina's agent, "the establishment of the agency also requires conduct on the part of Josephina conferring that status.  It was Evergreen's burden to show the validity of the arbitration agreement based on Josephina's express or implied consent to have her husband act as her agent."  (*Id.* at p. 589.)  The principal must in some manner indicate that the agent is to act for him, and formation of an agency is a bilateral matter; " ' "[w]ords or conduct by *both principal and agent* are necessary to create the relationship  . . . ." ' [Citation.]"  (*Flores, supra,* at p. 588; *Goldman v. Sunbridge Healthcare, LLC, supra,* 220 Cal.App.4th at p. 1173 [agency cannot be created by the conduct of the agent alone; rather, conduct by the principal is essential].)  "Although Evergreen presented evidence regarding Luis's conduct, it failed to offer evidence regarding *Josephina's* conduct."  (*Flores, supra,* at p. 588.)  The facts that Luis had signed the admissions documents, and that Josephina subsequently signed a general power of attorney giving Luis agency authority, did "not provide the necessary evidentiary support."  (*Ibid.*)  Thus, "no facts were presented suggesting that by signing the power of attorney form Josephina intended to ratify Luis's earlier agreement to the arbitration."  (*Id.* at pp. 588-589.)

The same is true here.  The record is devoid of evidence showing any conduct by McKennis suggesting that she ratified Starling's signature on the 2010 agreement. St. John's argument that "there is no evidence to suggest that Ms. McKennis was not fully aware of the facts and circumstances surrounding Ms. Starling's signing of the arbitration agreement . . . ." improperly flips St. John's burden of proof to McKennis.  It

20

is St. John's burden to establish the existence of a valid arbitration contract, and the absence of evidence does not meet this burden.

        4. *Equitable estoppel*

        St. John next urges that McKennis is equitably estopped from refusing to arbitrate. We disagree, for several reasons.

        While the general rule is that one must be a party to an arbitration agreement to be bound by it, an exception exists based on the doctrine of equitable estoppel.  (*Molecular Analytical Systems v. Ciphergen Biosystems, Inc., supra,* 186 Cal.App.4th at p. 706.) " 'A valid claim for equitable estoppel requires:  (a) a representation or concealment of material facts; (b) made with knowledge, actual or virtual, of the facts; (c) to a party ignorant, actually and permissibly, of the truth; (d) with the intention, actual or virtual, that the ignorant party act on it; and (e) that party was induced to act on it.  [Citation.]' " (*Young, supra,* 220 Cal.App.4th at p. 1131.)  "The determination of equitable estoppel ordinarily is a question of fact for the trier of fact, unless the facts are undisputed and can support only one reasonable conclusion as a matter of law."  (*Windsor Pacific LLC v. Samwood Co., Inc.* (2013) 213 Cal.App.4th 263, 272; *Estate of Bonzi* (2013) 216 Cal.App.4th 1085, 1106.)  St. John argues that these elements have been met here.

        First, we agree with McKennis that this claim has been waived because St. John failed to raise it below.  St. John avers that the elements of estoppel are met because (1)  Starling knowingly "forged" McKennis's name on the Arbitration Agreement; (2)  Starling never apprised St. John of the forgery and it neither knew nor had reason to know the signature was not genuine; (3)  St. John acted in reliance on the forgery because it admitted McKennis to the facility and failed to conduct an inquiry into whether Starling had legal authority to bind McKennis to arbitration; and (4)  Starling intended St. John to act on the forged signature by admitting McKennis.  McKennis responds that there is "scant evidence" of concealment; instead, given the language of the Admission Agreement, Starling likely innocently or mistakenly believed she could sign the

arbitration agreement on her mother's behalf.[6] St. John's theory clearly depends on a determination of disputed facts. The record contains no evidence, let alone undisputed evidence, in support of most of St. John's contentions.[7] Because St. John's "new theory involves an issue of fact . . . and the facts to support the theory were not developed below, we find the argument was waived for failure to raise it in the trial court." (*City of Merced v. American Motorists Ins. Co.* (2005) 126 Cal.App.4th 1316, 1327; *People ex rel. Totten v. Colonia Chiques* (2007) 156 Cal.App.4th 31, 40; *Bogacki v. Board of Supervisors* (1971) 5 Cal.3d 771, 780 ["The general rule that a legal theory may not be raised for the first time on appeal is to be stringently applied when the new theory depends on controverted factual questions"].)

In any event, St. John's argument is misplaced. As McKennis points out, St. John confuses the party to be estopped (McKennis) with the party who allegedly concealed the material facts (Starling). Starling is not the party seeking to avoid arbitration; McKennis is. There is no evidence in the record that McKennis ever concealed or misrepresented any facts, or that she intended that St. John act in reliance on them. As *Young* explained, on similar facts, "In this case, the critical threshold element is missing: Plaintiff did not represent or conceal any fact. Equitable estoppel is not available to appellants . . . ." (*Young, supra,* 220 Cal.App.4th at pp. 1131-1132.)

5. *St. John's public policy arguments*

Finally, St. John makes several arguments aimed at the conclusion that denying arbitration here would violate public policy. None persuade us.

---

**6** The Admission Agreement stated, for example, that the Resident's Representative, Starling, was "the person who will sign on your behalf to admit you to this Facility."

**7** Respondents urge that the trial court considered and rejected St. John's " 'forgery' argument" and implicitly found there was no fraud. They are incorrect. The trial court's ruling was based on its reading of *Pagarigan* and similar cases, Health and Safety Code section 1599.81, and its interpretation of the Readmission Agreement. To the extent the issue was raised at all, the court "decline[d] to consider the remaining arguments advanced by Plaintiff."

First, St. John argues it is "against public policy for Respondent to escape arbitration by allowing her agent to commit fraud upon St. John." St. John states that the law disfavors criminal conduct to avoid contractual obligations; and every contract contains an implied covenant of good faith and fair dealing (*Avery v. Integrated Healthcare Holdings, Inc., supra,* 218 Cal.App.4th at p. 61.) St. John avers that in light of the Admission Agreement's definitions of McKennis as "resident" and Starling as "resident's representative," "Respondent impliedly agrees that the arbitration agreement was procured by fraudulent inducement . . . ." We do not necessarily agree that the evidence shows Starling admitted she committed "fraud." But more to the point, there is no evidence that McKennis, the principal, had any inkling that Starling signed her name, and there is accordingly a lack of evidence that McKennis committed fraud or fraudulently induced St. John to enter into the Admission Agreement. As there is no valid Arbitration Agreement, one cannot have been procured by fraud.[8]

St. John also argues that a " 'person may not lull another into a false sense of security by conduct causing the latter to forebear to do something which he otherwise would have done and then take advantage of the inaction caused by his own conduct.' " (*Common Wealth Ins. Systems, Inc. v. Kersten, supra,* 40 Cal.App.3d at p. 1028.) St. John complains that it "materially changed its position in reliance on the admission contract" by allowing McKennis admission to the facility. But St. John offers only argument, not evidence, showing that it materially changed its position or forbore to take action in light of Starling's action. Moreover, in light of the fact that execution of the Arbitration Agreement was not, by law, a precondition to McKennis's admission, St. John's arguments are less compelling.

Nor are we persuaded by St. John's contention that McKennis may not adopt that part of the contract which is beneficial to her and simultaneously reject its burdens.

---

[8]   St. John cites *Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 30, for the proposition that "whether an arbitration agreement was . . . induced by fraud, is subject to arbitration." As noted, there is no arbitration agreement in effect between the parties, so St. John's point is not germane here.

(*NORCAL Mutual Ins. Co. v. Newton* (2000) 84 Cal.App.4th 64, 84.) As we have explained, the arbitration clause was not a valid provision of the contract. Moreover, given that agreement to arbitrate was optional, not required, it does not appear that McKennis obtained any benefit. (See *Warfield v. Summerville Senior Living, Inc., supra,* 158 Cal.App.4th at pp. 450-451 [resident did not seek to make use of the arbitration agreement and was not estopped to assert that it was unenforceable against her].)

Finally, St. John argues "it would be inequitable and against public policy for the Court to find the arbitration agreement is not binding on Respondent. *Pagarigan* and its progeny have not created safe passage for one person to forge another's signature on a contract in order to help the second person avoid arbitration later. Even assuming Ms. Starling 'innocently or mistakenly' signed Ms. McKennis's signature, if the Court allows Respondent to avoid arbitration, it will create an unintended precedent such that others in the future can intentionally deceive a contracting party by forging a signature, so that the individual whose signature was forged can claim he or she is not bound to arbitrate claims. This is particularly worrisome in the nursing home context as relatives of residents often complete paperwork . . . ."

There is no evidence that Starling signed her mother's name in an attempt to later avoid arbitration about an alleged injury that had not yet occurred. Further, the converse of St. John's argument is simply untenable – that is, that a valid arbitration contract is created by a forgery as long as the nursing home is in the dark about it. "[W]e are not at liberty to ignore the well-established California law that '[t]he party seeking to compel arbitration bears the burden of proving the existence of a valid arbitration agreement.' " (*Goldman v. Sunbridge Healthcare, LLC, supra,* 220 Cal.App.4th at p. 1178.) "Simply put, ' "[t]he strong public policy in favor of arbitration does not extend to those who are not parties to an arbitration agreement, and a party cannot be compelled to arbitrate a dispute that he [or she] has not agreed to resolve by arbitration." ' " (*Ibid.*)

While we are not unsympathetic to St. John's argument that a relative's "forgery" of admissions papers may prove problematic, it is not as if St. John is without readily

24

accessible means to ensure that a signature is actually the resident's. A nursing home can, for example, insist that the resident sign in the presence of a facility employee.

In sum, we conclude that the trial court properly denied St. John's motion to compel arbitration. In light of our conclusion, we do not reach McKennis's arguments that the arbitration agreement is unconscionable, or that it is unenforceable because it would lead to the possibility of inconsistent rulings.

## DISPOSITION

The order denying the motion to compel arbitration is affirmed. Costs are awarded to Respondents.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

ALDRICH, J.

We concur:

KITCHING, Acting P. J.

EGERTON, J.*

---

*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25